# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20826

United States Court of Appeals
Fifth Circuit

**FILED**
June 4, 2019

Lyle W. Cayce
Clerk

In re: CHARLES D. RABY,

      Movant.

Motion for an Order Authorizing
the United States District Court
for the Southern District of Texas
to Consider a Successive 28 U.S.C. § 2254 Petition

Before HIGGINBOTHAM, SMITH, and DUNCAN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Charles Raby was convicted and sentenced to death for the gruesome murder of seventy-two-year-old Edna Franklin. *Raby v. Dretke*, 78 F. App'x 324, 325 (5th Cir. 2003), *cert. denied*, 542 U.S. 905 (2004). In December 2018, Raby moved for an order authorizing the filing and consideration of a second-or-successive habeas corpus petition. Because Raby fails to meet the standard to warrant a second-or-successive petition, we deny the motion for authorization.

I.

Franklin was murdered in her living room after being severely beaten

No. 18-20826

and repeatedly stabbed, her throat cut. Raby, a friend of Franklin's grandsons, confessed.[1]

In June 1994, a Texas jury convicted Raby of capital murder, and he was sentenced to death based on the jury's answers to the special issues. The Texas Court of Criminal Appeals ("CCA") affirmed on direct appeal. *Raby v. State*, 970 S.W.2d 1, 9 (Tex. Crim. App.), *cert. denied*, 525 U.S. 1003 (1998). The CCA denied Raby's application for a state writ of habeas corpus. *Ex parte Raby*, No. WR-48,131-01 (Tex. Crim. App. Jan. 31, 2001).

The district court denied Raby's federal habeas petition. *Raby v. Cockrell*, No. 4:02-cv-00349, slip op. at 1 (S.D. Tex. filed Nov. 27, 2002). We declined a certificate of appealability ("COA"). *Raby*, 78 F. App'x at 325–29.

---

[1] Raby's confession stated, in relevant part, the following:

   I drank the bottle of wine and then I walked over to Lee's house on Westford Street. Lee lives there with his grandmother, Edna and his cousin Eric. There is an old Volkswagon [*sic*] in the drive way at their house. I walked up to the front door. The front door has a screen type door in front of a wooden door. I knocked on the door. I did not hear anyone answer. I just went inside. I sat down for a little bit on the couch. I called out when I got inside but I did not hear anyone say anything. I heard Edna in the kitchen. I walked into the kitchen and grabbed Edna. Edna's back was to me and I just grabbed her. I remember struggling with her and I was on top of her. I know I had my knife but I do not remember taking it out. We were in the living room when we went to the floor. I saw Edna covered in blood and underneath her. I went to the back of the house and went out the back door that leads into the back yard.

   Shortly after I had left Lee's house on Westford I was approached by a man and this man told me something like "I had better not catch you in my yard," "jumping his fences." Or something like that. I woke up later on the ground near the Hardy Toll Road and Crosstimbers. I walked home, on Cedar Hill from there. I remember feeling sticky and I had blood on my hands. I washed my hands off in a water puddle that is near the pipe line by the Hardy Toll Road. I do not remember what I did with my knife.

   The next day I knew I had killed Edna. I remembered being at her house and struggling with her and Edna was covered with blood when I left. I think I was wearing a black concert shirt, the blue jeans Im [*sic*] wearing and my Puma tennis shoes. I also had on a black jacket.

*Raby v. State*, No. AP-76,970, 2015 WL 1874540, at *2 (Tex. Crim. App. Apr. 22, 2015).

No. 18-20826

While his federal habeas petition was pending, Raby moved in state court for post-conviction DNA testing of four pieces of evidence: underwear found near Franklin, the nightshirt Franklin was wearing, Franklin's fingernail clippings, and a hair found on her hand (identified as belonging to one of Franklin's grandsons). *Raby v. State*, No. AP-74,930, 2005 WL 8154134, at *1 (Tex. Crim. App. June 29, 2005). *See* TEX. CODE CRIM. PROC. ANN. ch. 64 (West 2017). The CCA granted Raby's motion in part and allowed testing on the underwear, nightshirt, and fingernail clippings. *Raby*, 2005 WL 8154134, at *8.

Over a three-year period, the state trial court held a series of hearings concerning the DNA evidence. *Raby*, 2015 WL 1874540, at *1; *see also* TEX. CODE CRIM. PROC. ANN. art. 64.04. The nightshirt could not be located. Testing on the underwear showed only that the blood was from Franklin. Consequently, the hearings focused on the DNA evidence recovered from the fingernail clippings, which "contain[ed] a weak and incomplete DNA profile from an unknown male." The state district court concluded that

> [h]aving heard arguments, read the parties' briefing, affidavit evidence, and other exhibits, reviewed the trial transcript, and considered the testimony of experts, including forensic DNA experts interpreting the DNA test results that have been obtained, . . . the results are not favorable to [Raby], and that had the DNA test results obtained under Chapter 64 been available in 1994, it is reasonably probable that Raby would have been prosecuted or convicted.

*Raby,* 2015 WL 1874540, at *1. The CCA affirmed in 2015. *Id.* at *5–9. Raby filed a subsequent state habeas application that the CCA denied as an abuse of the writ. *Ex parte Raby*, No. WR-48,131-02, 2017 WL 2131819, at *1 (Tex. Crim. App. May 17, 2017) (per curiam).

In August 2017, Raby filed a Federal Rule of Civil Procedure 60(b)(6) motion for relief from judgment. The district court denied the motion, finding

3

No. 18-20826

that a change in decisional law "does not, without more, constitute extra-ordinary circumstances." *Raby v. Davis*, No. 4:02-cv-00349, slip op. at 5 (S.D. Tex. Apr. 5, 2018). We declined a COA. *Raby v. Davis*, 907 F.3d 880, 883 (5th Cir. 2018), *petition for cert. filed* (U.S. Mar. 4, 2019) (No. 18-8214).

Raby moves for an order authorizing the filing and consideration of a second habeas petition. His application presents four grounds. First, that the state destroyed exculpatory evidence such that it is no longer available for testing, in violation of *California v. Trombetta*[2] and *Arizona v. Youngblood*.[3] Second, that Joseph Chu, the state's forensic serologist, falsely referred to exculpatory serological results as "inconclusive," in violation of *Giglio v. United States*.[4] Third, that the state withheld material exculpatory evidence, in violation of *Brady v. Maryland*.[5] Fourth, that Raby is actually innocent such that his confinement violates the Eighth and Fourteenth Amendments.[6]

## II.

## A.

Federal habeas review for a prisoner in state custody is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L.

---

[2] 467 U.S. 479 (1984). "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488.

[3] 488 U.S. 51 (1988). In *Youngblood*, the Court modified *Trombetta* by holding that a state's failure to preserve potentially useful evidence is not a violation of due process unless the defendant can make a showing of bad faith on the part of the state actor. *Id.* at 58.

[4] 405 U.S. 150 (1972). *Giglio* extended the prosecution's *Brady* obligation by holding that both impeachment and exculpatory evidence fall within the bounds of the rule. *See id.* at 154; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985).

[5] 373 U.S. 83 (1963). *Brady* held that failure of the prosecution to turn over material exculpatory evidence to a defendant violates due process. *Id.* at 87.

[6] In *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013), the Court stressed that it had not yet determined whether a petition for habeas relief could be "based on a freestanding claim of actual innocence."

No. 104-132, Title I, 110 Stat. 1214, 1217–26 (codified as amended in scattered sections of Title 28). Because Raby previously filed a federal habeas petition, he must receive authorization from this court to file a second-or-successive petition. 28 U.S.C. § 2244(b)(3)(A).

We permit the filing of a successive petition only if we conclude that Raby's application makes a *prima facie* showing that it satisfies the strict requirements in § 2244(b). *Id.* § 2244(b)(3)(C). A *prima facie* showing is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014) (citation omitted). Consequently, if it seems reasonably likely that a successive petition meets the strict requirements provided in the statute, we will grant the motion for a successive petition. *Id.* Our decision to grant or deny authorization is not appealable and may not be the subject of a petition for rehearing or writ of certiorari. 28 U.S.C. § 2244(b)(3)(E).

Both parties concede that the claims presented by Raby were not raised in his initial federal habeas petition, so he must make a *prima facie* showing that he satisfies the requirements of § 2244(b)(2)(B):

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
>> . . .
>>
>> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>>
>> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2244(b)(2)(B).

5

No. 18-20826

A petitioner who makes such a showing must also overcome the statutory time bar. Generally, an applicant faces a one-year limitations period to file a federal habeas petition. *Id.* § 2244(d)(1). As relevant here, that period runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244-(d)(1)(D). We may apply equitable tolling, which "is applied restrictively and . . . is entertained only in cases presenting rare and exceptional circumstances where it is necessary to preserve a plaintiff's claims when strict application of the statute of limitations would be inequitable." *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (internal quotation marks and citation omitted).

Although the Supreme Court has not determined whether a petitioner may receive habeas relief based on a freestanding actual-innocence claim, "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Perkins*, 569 U.S. at 392. "The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review." *E.g.*, *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) (per curiam). Thus, we decline Raby's invitation to review his actual-innocence claim on its merits. If, however, one (or more) of Raby's claims satisfies the dual requirements of § 2244(b)(2)(B), a credible showing of actual innocence would allow him to pursue the claim, despite a procedural bar.[7]

In any event, our inquiry is limited to whether Raby has made a *prima facie* showing concerning any of his claims such that "it appears reasonably likely that the application satisfies the stringent requirement for the filing of

---

[7] The CCA dismissed the claims Raby raises here as an abuse of the writ. *Raby*, 2017 WL 2131819, at *1. Therefore, the state contends that they are procedurally defaulted. Because we decline to grant Raby's motion on alternative grounds, we do not reach this issue.

6

## No. 18-20826

a second or successive petition." *Campbell*, 750 F.3d at 530. We review each claim in turn.

### B.

Raby avers that "the state destroyed exculpatory or potentially useful evidence" in violation of *Trombetta* and *Youngblood*. Even assuming, *arguendo*, that the claim is not time-barred and that Raby could not have previously discovered the factual predicate for the claim using due diligence, he cannot "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Consequently, he fails to make a *prima facie* showing sufficient to warrant authorization for a second-or-successive habeas petition on this ground.

Raby asserts that Chu's decision to perform a highly consumptive Lattes test on the biological material recovered from Franklin's fingernails over a month after investigators recovered the material is evidence of bad faith.[8] Raby contends that, by doing so, Chu ensured that his conclusions could not be second-guessed. Raby avers that this evidence, especially when read in conjunction with the infamous Bromwich Report,[9] constitutes a *prima facie* showing on this claim.

---

[8] An expert witness for the state testified—as part of the article 64.04 hearings—that a Lattes test is an excellent test when performed on very fresh samples only a couple of days old. Raby therefore implies that performing the test on a not-so-fresh sample—recovered over a month before testing—constitutes bad faith as defined in *Youngblood*.

[9] In the early 2000s, concerns arose regarding the practices and procedures employed by the Houston Police Department's Crime Lab. *Napper v. Thaler*, Nos. H-10-3550, H-10-3551, 2012 WL 1965679, at *13 (S.D. Tex. May 31, 2012). The Acting Chief appointed an investigative team, led by Michael Bromwich, to conduct an outside review of the lab and its practices, both past and present. *Id.* at *13, 15. The team published a report in 2007 that became known as the "Bromwich Report." *See id.* at *14–15.

No. 18-20826

In response, the state maintains that Raby failed to show Houston Police Department ("HPD") lab employees, including Chu, "destroyed potentially useful evidence in bad faith." The state asserts that there is no evidence Chu performed the Lattes test with knowledge that Franklin's fingernail clippings contained potentially useful evidence and contends that the Bromwich Report's conclusions concerning the use of inadequate procedures did not establish that Chu and other crime lab employees acted in bad faith. Instead, the report "explained that the failures in the HPD Crime Lab were the result of a lack of training and of the isolation of the DNA section of the Crime Lab from the forensic community, not the actions of rogue analysts." *Napper*, 2012 WL 1965679, at *33 (internal quotation marks omitted).

Moreover, *Trombetta* requires a defendant to demonstrate that (1) the exculpatory value of the evidence was obvious before its destruction and (2) the evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *see also Youngblood*, 488 U.S. at 56 n.*. The state maintains that Raby fails to show that the exculpatory value of the evidence was apparent to Chu when he performed the Lattes test—*i.e.*, "*before* the evidence was destroyed." *Trombetta*, 467 U.S. at 489 (emphasis added). Consequently, Raby fails to establish a due process violation under either *Trombetta* or *Youngblood*.

The state has the better of the argument. First, the evidence presented by Raby fails to establish bad faith on the part of Chu. Contrary to Raby's assertion, Chu's decision to perform the highly consumptive Lattes test on the biological material before employing the preferred Absorption-Elution ("AE") test is not evidence of bad faith. Rather, in line with the findings of the Bromwich Report, it is evidence of a lack of training. Further, there is nothing in Raby's application to suggest that the exculpatory value of the fingernail

8

clipping evidence—which, to be clear, does not exonerate Raby—was apparent when Chu performed the Lattes test. As the Supreme Court has made clear, the evidence's exculpatory value must be obvious before its destruction. *E.g.*, *Youngblood*, 488 U.S. at 56 n.*. Raby thus fails to make a *prima facie* showing on this claim, and it is not reasonably likely that his claim meets the requirements of 28 U.S.C. § 2244(b)(2)(B)(ii). We therefore cannot allow his application on this claim to proceed.

C.

Raby asserts that "the state knowingly sponsored or failed to correct Mr. Chu's and the lead HPD detective's false testimony regarding exculpatory blood typing results," in violation of *Giglio*. To establish a due process violation under *Giglio*, a habeas petitioner must show "(1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). Evidence is material in the *Giglio* sense if it is reasonably likely that it "could have affected the jury's verdict." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citation and quotation mark omitted).

As a preliminary matter, Raby fails to establish that the state knowingly presented false testimony. First, as the state emphasizes, Chu's testimony was probably the result of inadequate training and procedures at the HPD crime lab. *Cf. Napper*, 2012 WL 1965679, at *35–41. The detection of A, B, and H antigen activity on fingernail clippings from Franklin's right hand, and B and H antigen activity on fingernail clippings from her left hand, did not conclusively exclude Raby as a contributor to the tested sample, especially given that H antigen activity is present in those individuals who, like Raby, possess

blood type O.[10]

Moreover, Raby does not show that the prosecution used the testimony knowing that it was false. Nothing in the record suggests that prosecutors or the police department were aware of the crime lab's deficiencies in 1994, and HPD took immediate action in disclosing issues with the lab when they came to light in late 2002.[11] At least two district courts have rejected similar false-testimony claims concerning the HPD crime lab (and even Chu specifically).[12]

Even assuming, *arguendo*, that Raby could establish a constitutional violation under *Giglio*—an assumption that is, again, doubtful—and that he could satisfy AEDPA's diligence requirement, 28 U.S.C. § 2244(b)(2)(B)(i), he does not have a reasonable likelihood of showing, by clear and convincing evidence, that but for the *Giglio* violation, not a single reasonable juror would have found him guilty of murder. Raby contends that had the serology testing been properly undertaken and reported, HPD would have conducted further testing and considered additional suspects. He also avers that defense strategy would have been different and that, in light of blood typing results showing A antigen activity in the biological material recovered from Franklin's right hand, "all other evidence presented by the [s]tate would have little value, or be outright contradicted, including the custodial statement." Raby asserts that this evidence is so compelling that any reasonable factfinder would have disregarded Raby's confession.

---

[10] Franklin had blood type B. Individuals with blood type A have A antigens on their red blood cells, individuals with blood type B have B antigens on their red blood cells, and individuals with blood type AB have both A and B antigens on their red blood cells.

[11] *See, e.g.*, *Alvarez v. Davis*, No. 4:09-CV-3040, 2017 WL 4844570, at *38 (S.D. Tex. Oct. 25, 2017), *appeal filed* (5th Cir. Jan. 18, 2018) (No. 18-70001).

[12] *E.g.*, *id.* at *38–39; *Napper*, 2012 WL 1965679, at *40–41 (highlighting that the CCA found that Chu did not commit perjury and that the state did not use false testimony).

In response, the state stresses that "Raby's assertion that the presence of a foreign blood type in Ms. Franklin's hands exculpates him must be considered in light of the extensive circumstantial evidence of his guilt." The state proffers the following evidence:  Raby was a friend of Franklin's grandsons. Roughly a week before her murder, Franklin and Raby were involved in an altercation.  Franklin informed an intoxicated Raby that he was not welcome in her house, and he responded by verbally abusing Franklin and hurling a beer bottle onto her porch.

At approximately 5:00 pm on the day of the murder, Raby stopped at the home of Shirley Gunn, who lived near Franklin.  Raby was wearing a jacket and carrying a knife, approximately 2- to 3-inches long, that he used to groom his fingernails while at Gunn's house.  Gunn stated that she smelled alcohol on Raby's breath.  Raby left her home at around 6:00 pm.  Before leaving, Raby asked Gunn whether Gunn's son was at Franklin's house.  Barbara Wright, who lived about ten blocks from Franklin, witnessed Raby pass by at around 5:00 pm and again at around 6:00.  He was carrying a black jacket on his shoulder.

At 6:45 pm, Franklin spoke with her daughter, Linda McClain, on the phone.  Sometime between 7:00 and 7:45, Raby knocked on the back door of Mary Alice Scott's home.  Scott also lived close to Franklin.  After hearing the knock, Scott looked outside and observed Raby, in her driveway, walking toward the street.  Scott testified that Raby was wearing a dark jacket and blue jeans.

At around 8:00 pm, Martin Doyle pulled into the driveway of Leo Truitt, who lived behind Franklin's home.  Doyle witnessed a white male cut through Truitt's yard and hop over his fence, then head east away from Truitt's home. Both Doyle and Truitt followed the man down the street but ended their pur-

No. 18-20826

suit after they confronted him and determined he had not stolen anything from Truitt's yard.

At trial, Doyle described the man's height as six feet or less. In court, Raby was asked to stand. Doyle then stated that Raby was about the same height as the man in Truitt's yard. In a statement given to police the day after Franklin's murder, Truitt stated that the man in his yard weighed about 160 pounds and was between five feet, six inches and five feet, seven inches tall. Raby is approximately five feet, seven inches tall and weighs roughly 160 pounds.

Police attempted to arrest Raby on Friday, October 16 (the day after the murder), but he evaded capture by fleeing out the back door of his girlfriend's home. He was arrested without incident a few days later and taken to the station. He waived his *Miranda* rights and agreed to speak with police. Sergeant Waymon Allen asked Raby to recall the events of Thursday, October 15. Raby initially recalled a version of events that did not place him at Franklin's home that night. But after Allen told Raby that he knew Raby was being untruthful because one of Franklin's neighbors witnessed Raby jump over a fence leaving Franklin's home, Raby became emotional and stated, *inter alia,* "I was there" and "I saw her on the living room floor."[13] Raby then confessed.

Considering the overwhelming circumstantial evidence and Raby's confession, Raby has not shown that it is reasonably likely that he will be able to demonstrate, by clear and convincing evidence, that but for the alleged *Giglio* violation, no reasonable juror would have voted to convict him of murder. *See* 28 U.S.C. § 2244(b)(2)(B)(ii). To forestall this inevitable conclusion, Raby

---

[13] Franklin's body was found on the floor of her living room. *Raby*, 970 S.W.2d at 2.

asserts that his confession was unreliable for any number of reasons.[14]  For example, he contends that he could not have struggled with Franklin because no blood was found on his clothes, and he did not have any scratches on his body.  Such evidence does not, however, contradict Raby's confession.  It is entirely possible that given Franklin's frailty, "she was taken by surprise, over-powered, and unable to fight back."  *Raby*, 2015 WL 1874540, at *4.  The absence of blood and scratches is also reasonable considering Raby's written confession that he grabbed her from behind while holding his knife.  *Id.*

Raby avers that his statement about entering through the front door was inconsistent with the police investigation finding that the assailant entered through a bedroom window by dislodging a screen.  As the state highlights, however, Raby's intoxication on the night of the murder may have caused him to misremember some of the details.  Uncontradicted evidence placed Raby near Franklin's home at the time she was murdered.  Moreover, shortly before Franklin was murdered, Raby asked a friend's mother whether her son was at Franklin's house.  Additionally, despite his claim that he has recanted his confession, Raby does not deny murdering Franklin.  Instead, Raby merely states that he has "no memory of killing Mrs. Franklin," but at the same time emphasizes that he "did not rape her."

Raby also contends that the presence of A antigen activity in the biological material recovered from Franklin's right hand is inconsistent with his confession.  The serological results, however, do not exclude Raby as a contributor of the biological material.  Nor do they necessarily demonstrate the presence of an unknown assailant.  The A antigen activity may have come, for example,

---

[14] In 2003, during Raby's first habeas proceeding, we emphasized that Raby "signed a confession to every aspect of the relevant charge, with the exception of the explicit act of stabbing."  *Raby*, 78 F. App'x at 327.  Raby adopted his confession in open court by affirming that it was "true."

from contamination at the HPD crime lab, which was criticized in the Bromwich Report for failing to utilize proper controls to detect such contamination. It could have also come from the saliva or perspiration of an individual who had recently been in Franklin's home.

The absence of Raby's DNA on Franklin's body also does not contradict his confession. Raby's grandsons, for example, were often in close contact with Franklin, and their DNA was not found on her hands. DNA analysis did, however, find the presence of low-level male DNA on two of Franklin's fingernails. *Raby*, 2015 WL 1874540, at \*6. "The sample was a mixture of at least two males," but the DNA did not belong to either Raby or Franklin's grandsons. *Id.* Neither the state's expert, nor Raby's, could rule out contamination as the source of the DNA, *id.* at \*7, particularly since DNA collection standards were different in 1992 than they are now, *id.* at \*6. The state's expert also contended that Franklin "could have picked up male DNA from laying on the floor after her attack." *Id.* at \*7. In any event, there was no way to determine when Franklin encountered the unknown male DNA. *Id.*

The larger point is this: After twenty-five years, Raby seeks to relitigate his state murder conviction in federal court on its merits. AEDPA, however, definitively bars him from doing so. We readily acknowledge that the previously unavailable evidence muddies the waters. But at this stage of the proceedings, a greater showing is required, and we are bound by the strict standards outlined in § 2244(b). Raby does not establish that if the newly discovered evidence had been available to him in 1994, no reasonable juror would have voted to convict. Notably, Sergeant Allen, the lead detective, acknowledged at trial that there was no physical evidence connecting Raby to the crime. In spite of this, the jury voted to convict Raby of murder, undoubtedly based on the strength of the other evidence presented.

No. 18-20826

Even with multiple generous assumptions in his favor—*i.e.*, that Raby's claims are not procedurally barred or time-barred and that they satisfy § 2244-(b)(2)(B)(i)'s diligence requirement[15]—Raby does not make a *prima facie* showing that § 2244(b)(2)(B)(ii)'s requirements are met. We therefore deny his petition for authorization to proceed on his *Giglio* claim.

D.

Raby contends that "the [s]tate withheld material, exculpatory evidence," including (1) blood serology results indicating an unidentified source to the sample of blood recovered from under Franklin's fingernails and (2) lab results finding no blood on the clothing Raby wore on the night of the murder, in violation of *Brady*. To establish a due process violation under *Brady*, a habeas petitioner must satisfy three elements. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

First, the evidence suppressed must be favorable to the defendant. *Id.* at 281. The evidence may be either exculpatory or impeaching. *Id.* at 282. Second, the state must have suppressed the evidence. *Id.* The suppression may be willful or inadvertent. *Id.* Third, "prejudice must have ensued"—*i.e.*, the suppressed evidence must have been material. *Id.* "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. A *Brady* violation must be found if a petitioner demonstrates "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the

---

[15] In fact, the state concedes none of these points and makes compelling arguments to the contrary.

verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  It is Raby's burden under AEDPA to establish that he has a viable claim such that he is entitled to relief. *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

As an initial matter, Raby fails to carry his burden concerning the second element.  The state notes that "Raby's *Brady* claim depends critically on his assertions that trial counsel, Felix Cantu, was not provided a copy of Mr. Chu's lab report during trial and was, consequently, unaware that Mr. Chu's testing revealed the presence of an A blood type and did not indicate the presence of blood on Raby's clothes."  At trial, however, the prosecution asserted that it had opened its entire file to Raby and his counsel.[16]  Raby's counsel did not contradict this assertion.  Cantu did receive a copy of an offense report stating that the blood typing results were "inconclusive."  Importantly, Cantu acknowledged in a 2009 affidavit that the HPD Crime Lab report may have been produced to him during trial.[17]

---

[16] The trial transcript reads, in relevant part:

State Prosecutor:  I would like the record to reflect that the State at this time has opened its entire file to the Defense. . . . For the record, we have also agreed to submit a bunch of records on the Defendant, all of which are on file, dating back to the time when the Defendant was 12 years old.

. . .

Trial Court:  Motion for discovery and inspection I think you've been granted that.  It's my understanding that the State has opened the file to the Defense, and I know from previous conversations on and off the record, the State has agreed to give you just about everything that they have.

State Prosecutor:  That's correct, Your Honor.  Both lawyers have looked at the State's case.  They have taken a lot of time doing that.  I kept them abreast on a daily basis of the latest developments as I find incriminating evidence or exculpatory evidence, as it were.  I have turned over the names of at least one or two witnesses they may want to call in mitigation on punishment.  And as I said before, we have provided them with a copy of all records of everything on file.

[17] In that affidavit, Cantu stated,

That report was either never produced to me at trial, or it was produced in the midst of a witness examination; in either case, I had no opportunity to incorpor-

No. 18-20826

However, even assuming that Raby could make a sufficient showing on his *Brady* claims and could satisfy AEDPA's diligence requirement, 28 U.S.C. § 2244(b)(2)(B)(i), he does not have a reasonable likelihood of showing, by clear and convincing evidence, that but for the alleged *Brady* violation, not a single reasonable juror would have found him guilty of murder. *Id.* § 2244-(b)(2)(B)(ii), (3)(C). Consequently, we cannot permit him to proceed with this claim.

The motion for an order authorizing the filing of a successive 28 U.S.C. § 2254 petition is DENIED.

---

ate the contents of that page into my examination, much less submit it to someone with the expertise to explain what the notes on that chart meant. I am told that the report was not within the trial files I forwarded to Mr. Raby's current counsel in about 2001, and that is what I would expect.

Raby notes that when his current counsel began representing him in 2001, "they collected the trial record and the other materials they could obtain, including via the Public Information Act, from former counsel, as well as materials Mr. Raby's friends had succeeded in obtaining to that point." "Among those boxes was a collection of about 40 pages appearing to come from the HPD Crime Lab." Raby states that "[a] single page in this pile of pages says in handwriting within a chart, for one hand, 'A +2', and for the other hand, nothing about 'A'; there is no other information or narrative report, other than the homicide report's short supplement declaring the results inconclusive." Thus, it is, at best, unclear whether Chu's notes and findings concerning the presence of A antigen activity were available to Raby at trial.

17