# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-20565

United States Court of Appeals
Fifth Circuit

**FILED**

August 16, 2019

In re:  LARRY SWEARINGEN,

Lyle W. Cayce
Clerk

> Movant

Motion for an Order Authorizing the United States District Court
for the Southern District of Texas to Consider a Successive
28 U.S.C. § 2254 Petition and for Stay of Execution

Before COSTA, WILLETT, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Larry Ray Swearingen, convicted nineteen years ago of capital murder for strangling nineteen-year-old Melissa Trotter, seeks permission to file a fourth federal habeas corpus petition. He also moves to stay, for the fifth time, his execution date, scheduled for the evening of Wednesday, August 21, 2019. Finding Swearingen's claims fail to meet the strict requirements imposed by 28 U.S.C. § 2244(b) for authorizing a successive petition, we DENY his application and also DENY his motion for stay of execution.

## I.

The facts and extensive litigation history of Swearingen's case have been catalogued elsewhere. *See, e.g., Swearingen v. State*, 101 S.W.3d 89, 92 (Tex. Crim. App. 2003) (direct appeal); *Swearingen v. Presiding Judge of 9th Judicial Dist. Court, Montgomery Cty.*, 2005 WL 995214 (Tex. Crim. App. 2005) (mandamus petition); *Swearingen v. Dretke*, No. H-04-2058, slip op. (S.D. Tex.

No. 19-20565

Sept. 8, 2005) (first federal habeas); *Swearingen v. Quarterman*, 192 F. App'x 300 (5th Cir. 2006) (per curiam) (first federal habeas), *cert. denied*, 127 S. Ct. 1269 (2007); *Ex parte Swearingen*, 2008 WL 650306 (Tex. Crim. App. 2008) (third state writ); *Ex parte Swearingen*, 2008 WL 5245348 (Tex. Crim. App. Dec. 17, 2008) (third state writ), *cert. denied*, 129 S. Ct. 1383 (2009); *Ex parte Swearingen*, 2009 WL 249759 (Tex. Crim. App. Jan. 27, 2009) (fourth state writ); *In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) (per curiam) (second federal habeas); *Swearingen v. Thaler*, 2009 WL 4433221 (S.D. Tex. Nov. 18, 2009) (second federal habeas); *Ex parte Swearingen*, 2009 WL 249778 (Tex. Crim. App. 2009) (sixth state writ); *Swearingen v. State*, 303 S.W.3d 728 (Tex. Crim. App. 2010) (third DNA motion); *Swearingen v. Thaler*, 421 F. App'x 413, 414 (5th Cir. 2011) (per curiam) (second federal habeas), *cert. denied*, 132 S. Ct. 1632; *In re Swearingen*, No. 11-20276, slip op. (5th Cir. May 9, 2011) (per curiam) (third federal habeas); *Swearingen v. Obama*, 2011 WL 2037607 (S.D. Tex. May 20, 2011) (civil rights complaint construed as unauthorized federal habeas); *Ex Parte Swearingen*, 2011 WL 3273901, (Tex. Crim. App. 2011) (sixth state writ); *Ex parte Swearingen*, 2012 WL 6200431 (Tex. Crim. App. 2012) (sixth and seventh state writs), *cert. denied sub nom. Swearingen v. Texas*, 570 U.S. 905 (2013); *State v. Swearingen*, 424 S.W.3d 32 (Tex. Crim. App. 2014) (fourth DNA motion); *In re Swearingen*, 2014 WL 1101761, (Tex. App. 2014) (mandamus petition); *State v. Swearingen*, 478 S.W.3d 716 (Tex. Crim. App. 2015) (fifth DNA motion), *cert. denied*, 137 S. Ct. 60; *Swearingen v. Keller*, 2017 WL 6803366 (W.D. Tex. Nov. 9, 2017) (suit against Texas Court of Criminal Appeals dismissed as frivolous). We provide a skeletal recitation here.

Swearingen was sentenced to death in 2000 after a Texas jury determined that he murdered Trotter by strangulation while committing, or attempting to commit, kidnapping or sexual assault. His conviction was based on a "mountain of inculpatory evidence." *Swearingen*, 303 S.W.3d at 736

No. 19-20565

(quoting *Ex parte Swearingen*, 2009 WL 249778, at *9 (Cochran, J., concurring)); *see also, e.g., Swearingen*, 2009 WL 4433221 at *2–3 (cataloguing "the extensive evidence of [Swearingen's] guilt which the State adduced at trial"). The Texas Court of Criminal Appeals ("TCCA") affirmed his conviction and sentence. Over the next two decades, "Swearingen has filed a convoluted tangle of habeas applications, *pro se* motions, mandamus actions, and amended pleadings," seeking to overturn his conviction and postpone his death sentence. *Id.* at *6; *see also id.* at *6–10 (recounting state and federal post-conviction litigation history through 2009); *Swearingen*, 478 S.W.3d at 719 (recounting history of motions for post-conviction DNA testing). These legal machinations have resulted in Swearingen's execution being put off five times.

On March 12, 2019, his sixth execution date was set for Wednesday, August 21, 2019. Seven days before the execution date, Swearingen sought our court's authorization to file a fourth habeas petition based on two claims. First, based on a recent letter from the Texas Department of Public Safety ("DPS"), Swearingen claims the State sponsored "false and misleading" trial testimony regarding blood flecks found under Trotter's fingernails, in violation of *Giglio v. United States*, 405 U.S. 150 (1972). Second, based on another recent DPS letter, Swearingen claims the State withheld evidence that a criminologist had "manufactured" evidence that the torn pantyhose used to strangle Trotter matched the pantyhose found at Swearingen's house, in violation of both *Giglio* and *Brady v. Maryland*, 373 U.S. 83 (1963). Based on these claims, Swearingen has also moved for a stay of execution.

## II.

### A.

Swearingen must receive this court's authorization to file a second or successive petition. 28 U.S.C. § 2244(b)(3)(A); *see generally, e.g., In re Raby*, 925 F.3d 749, 754 (5th Cir. 2019). We may give that authorization only if we

conclude that Swearingen's application makes a *prima facie* showing that it satisfies the strict requirements in § 2244(b). *Id.* A *prima facie* showing is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014) (citation omitted). Consequently, if it seems reasonably likely that a successive petition meets the strict requirements provided in the statute, we will grant the motion for a successive petition. *Id.*

As both parties concede that Swearingen's present claims were not raised in previous federal habeas petitions, Swearingen must therefore make a *prima facie* showing that he satisfies the requirements of § 2244(b)(2)(B):

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> ...
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2244(b)(2)(B).

This analysis does not address the merits of Swearingen's two claims, but only whether Swearingen "makes a *prima facie* showing that [he] can meet the [two] requirements of § 2244(b)(2)." *Swearingen*, 556 F.3d at 347. Within that framework, we consider each of Swearingen's claims in turn.

## B.

Swearingen claims that a recent letter from the DPS crime lab director—sent to Swearingen's counsel on August 9, 2019—shows the State sponsored "false and misleading" trial testimony from a DPS analyst, Cassie Carradine,

concerning blood flecks found under Trotter's fingernails. Evidence at trial showed that the DNA profile derived from these flecks matched neither Trotter nor Swearingen. *Swearingen*, 303 S.W.3d at 735. According to Swearingen, Carradine testified this blood came from "contamination" of the sample, leading the jury to discount the possibility that the blood actually pointed to someone else as Trotter's murderer. Now he claims that the 2019 DPS letter shows Carradine's testimony was fraudulently concocted by the State in violation of *Giglio*. This claim fails to meet both of the § 2244(b)(2)(B) threshold requirements.

At the outset, we observe that Swearingen mischaracterizes what the DPS letter says. He claims that the letter "proves" that Carradine's testimony was "false and misleading" and thus "demonstrates that the State sponsored the false contamination theory for the purpose of misleading the jury." The letter (which we reproduce in full below) says nothing like that. The letter first notes that Carradine "*was* qualified" to opine about contamination "within the DPS laboratory or based on the packaging and condition of the evidence," but that she lacked "direct knowledge" about how the evidence was "collected or stored prior to its submission to DPS" (emphasis added). Thus, the letter states that a "more appropriate answer" from Carradine "would have been that she could not speak to the possibility of contamination of the samples when they were outside the control of the DPS laboratory." Next, the letter states that Carradine had an "insufficient basis" to opine regarding contamination and that, therefore, she should have testified that "[t]he full range of possibilities include contamination or that it was not contamination and the [DNA] profile did come from the evidence." Contrary to Swearingen's characterization, the letter does not say that Carradine testified "falsely" and says nothing to suggest that the State "sponsored" a "false contamination theory" to "mislead" the jury. Instead, the letter says at most that Carradine lacked a foundation to

5

opine on contamination that may have occurred when the samples were *outside* DPS custody, and that her answers should have recognized that nuance.

We also note that Swearingen's application neither quotes Carradine's actual trial testimony nor provides transcripts of her testimony. Nonetheless, Swearingen baldly claims that Carradine "definitively told the jury" that the blood flecks were "the result of contamination either at the DPS Crime Lab or at earlier Autopsy [*sic*]." That is false. The trial record pages Swearingen cites to support that claim tell a different story. After describing how she collected the flakes, Carradine testified only that there was a "possibility" of contamination. And while she briefly referred to the possibility that the flecks may have been deposited "at the time . . . the sample was being collected," she focused far more on the possibility that the contamination might have occurred in the DPS lab. Furthermore, Swearingen's counsel objected to Carradine's testimony as "speculation," and then cross-examined her extensively on how the fingernail scrapings were packaged and how she handled them. During that cross-examination, Carradine was asked how the samples were transported to DPS and she responded, "I have no way of knowing how they were transported to the office."

Having properly characterized Swearingen's claim regarding the letter, we can now assess whether his claim meets the two prongs of § 2244(b)(2)(B). We conclude it meets neither.

First, the claim's "factual predicate"—that Carradine lacked a foundation for her testimony regarding possible contamination—could have been discovered long before the DPS letter was sent in August 2019. Indeed, the record shows that Swearingen's attorneys were *already* aware of the issue: His trial attorneys objected to Carradine's testimony on this point as "speculative," they cross-examined her on how she received and handled the fingernail scrapings, and they elicited an admission that she had "no way of

knowing" how the samples were handled before arriving at DPS. More broadly, whether the blood flecks came from contamination was vigorously contested at trial. *See, e.g., Swearingen*, 424 S.W.3d at 39 (observing that "[t]he jury chose to believe that the foreign DNA either was contamination or that it came from outside the context of the crime"); *Swearingen*, 2009 WL 249778 at *5 n.7 (Cochran, J., concurring) (listing post-conviction court's findings on blood flakes). Any "reasonable attorney would have been put on notice" that they should have probed the basis for Carradine's testimony on this issue—and Swearingen's attorneys did just that at trial. *See Blackman v. Davis*, 909 F.3d 772, 779 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1215 (2019).

Second, even assuming the facts underlying this claim are true —again, that Carradine lacked a foundation for testifying about possible contamination—we cannot say that no reasonable jury would have found Swearingen guilty "in light of the evidence as a whole." 28 U.S.C. § 2244(b)(2)(B)(ii). As the State points out, Carradine's testimony was cumulative of more detailed expert testimony from Dr. Joye Carter, from which a jury might have readily reached the same conclusion about the blood. And even if we assume the foreign DNA under Trotter's fingernails was *not* from contamination, that would not clearly and convincingly exonerate Swearingen. We cannot improve on the TCCA's reasoning on this point:

> We are not persuaded that results showing the presence of another DNA donor in the fingernail scrapings would overcome the "mountain of evidence" of the appellee's guilt. Primarily, this is because the victim's having encountered another person would not factually exclude the appellee from having killed her.

*Swearingen*, 424 S.W.3d at 38–39. Given that "mountain of evidence," jurors could have found the DNA evidence outweighed by the prosecution's case, even

without a suggestion that the sample was contaminated.[1] While theoretically possible that DNA evidence from the blood flakes could have swayed the jury, it is not sufficient under § 2244(b) merely to show that evidence "muddies the waters." *In re Raby*, 925 F.3d at 759. "Clear and convincing" evidence is required. § 2244(b)(2)(B)(ii). Even assuming Carradine's testimony on this point lacked any foundation, Swearingen has not come close to establishing that "no reasonable factfinder" would have found him guilty.[2]

C.

Swearingen next claims that, in violation of *Giglio*, the State sponsored false trial testimony from a criminologist, Sandy Musialowski, concerning the degree of "match" between the ligature used to strangle Trotter and the torn pantyhose found at Swearingen's home. He also claims that, in violation of *Brady*, the State withheld exculpatory and impeaching evidence on this issue. His *Giglio* claim is based on another recent DPS letter which he says "retracts" Musialowski's opinion that the ligature and the pantyhose matched. His *Brady*

---

[1] Swearingen cites four state cases where blood under a victim's fingernails was found sufficient to support a guilty verdict. *See Cotton v. State*, 144 So.3d 137, 142 (Miss. 2014); *State v. Abdelmalik*, 273 S.W.3d 61, 66 (Mo. App. 2008); *State v. Scott*, 97 So.3d 1046, 1052 (La. Ct. App. 2012); *State v. Gibbs*, 763 N.W.2d 430, 443 (ND 2009). Those cases do not help his claim. The cases do not stand for the proposition that the presence of foreign DNA under the victim's fingernails necessarily establishes a defendant's *innocence*, particularly in a case like this one where there is a massive amount of evidence, distinct from the fingernail evidence, tying the defendant to the crime.

[2] Reinforcing this point, Swearingen also fails to establish that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense" because he has not put forward a prima facie case for a constitutional violation. 28 U.S.C. § 2244(b)(2)(B)(ii). For purposes of a *Giglio* claim, "due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured." *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002); *see also Raby*, 925 F.3d at 756–57. While Swearingen argues that Carradine's testimony was false, he fails to argue the State knew it was false at the time. Thus, Swearingen fails to show a *prima facie* constitutional error under *Giglio*, and so he cannot establish that "but for constitutional error" no rational jury would have found him guilty.

claim is based on notes, written by Musialowski during her examination of the torn pantyhose, that he claims the State withheld. We conclude that these interrelated claims fail to satisfy § 2244(b)(2)(B).

The *Giglio* claim turns on a July 19, 2019 letter from DPS that Swearingen again misrepresents. The letter (also reproduced below) does not "retract" Musialowski's testimony—it merely says her testimony about the match between the ligature and the torn pantyhose would today use different terminology. "Today," says DPS, "we would report that the two pieces [of pantyhose] were once joined, but would not include the statement 'to the exclusion of all others.'" At the same time, the letter affirms that Musialowski "did not err in her reporting or testimony regarding [the pantyhose match]." We think it sufficient to dispose of this claim to say this: Even if proven true, we do not think the claim provides clear and convincing evidence that no reasonable jury would find Swearingen guilty. In other words, even if Musialowski's testimony were revised from "the litgature and the pantyhose were a unique match *to the exclusion of all others*," to "the litgature and the pantyhose were *once joined*," we see no possibility that this would make any difference to Swearingen's guilt.

Finally, the *Brady* claim turns on Musialowski's allegedly undisclosed notes. The notes document that, at the initial stages of her examination, Musialowski could not say the ligature and the pantyhose were a "physical match," but as her examination progressed, she was able to determine that they were indeed a "unique physical match." Swearingen claims this is evidence that his attorneys could have used to impeach Musialowski's key conclusion linking him to the murder weapon. We conclude this claim fails both prongs of § 2244(b)(2)(B).

With respect to the due diligence prong, § 2244(b)(2)(B)(i), Swearingen's attorneys were obviously aware at trial of the precise nature of Musialowski's

examination of the pantyhose, which is reflected in the allegedly undisclosed notes. For instance, the statement plausibly helpful to Swearingen in the notes is the notation that Musialowski, having initially observed the ligature and pantyhose under glass plates, observed "no physical match between ligature and pantyhose." But this phase of the investigation, and the difficulties Musialowski faced, were discussed in detail at trial. Musialowski testified that she attempted to observe the ligature and pantyhose on glass plates, but "because the ends were rolling, it was difficult for [her] to keep the ends down to compare." So, she used other methods, including pinning the fabric to a foam board, which ultimately led to her conclusion of a match. The notes are consistent with Musialowski's testimony at trial, and thus do not constitute new evidence previously undiscoverable by due diligence. Swearingen's claim thus fails under § 2244(b)(2)(B)(i).

Alternatively, Swearingen's claim about the notes fails the second prong of § 2244(b)(2)(B). As already discussed, Musialowski's notes were basically cumulative of her trial testimony about her developing examination of the pantyhose and ligature. Introducing the notes would simply have established—as her trial testimony did—that Musialowski did not initially see a match when analyzing the items on glass plates, but did see one upon further investigation. These facts were already present in her trial testimony and would have been, at most, marginally enhanced by the notes. Thus, the notes, even if introduced and credited by the jury, would not have led to a trial in which "no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B).

That conclusion is particularly compelling given that § 2244(b) requires us to assess the claim "in light of the evidence as a whole." § 2244(b)(2)(B)(ii). We have before alluded to the "mountain of inculpatory evidence," discussed in detail by numerous courts, state and federal, that seals Swearingen's guilt for

No. 19-20565

Trotter's murder. *Swearingen*, 303 S.W.3d at 736. We end by quoting a relatively succinct summary of that evidence from a federal district court, which underscores why Swearingen's "new" claims in this latest phase could not possibly have made any difference to the outcome of his trial:

> To reiterate, Swearingen was the last person that Ms. Trotter was seen with alive. Ms. Trotter had been in Swearingen's truck, where he forcibly removed hair follicles. Swearingen's histological evidence does not explain why she was in his house that day, why it was later found to be in disarray, and why he falsely claimed that there had been a burglary there. The evidence itself does not explain why papers belonging to Ms. Trotter were found near the house of Swearingen's parents and her cigarettes were in Swearingen's house. The new information does not explain why Ms. Trotter was found wearing the same clothes as when she disappeared and why she had a note given to her by a friend on December 8 in her back pocket. The new evidence does not show why cell phone records traced Swearingen to a location near where Ms. Trotter was found. Histology does not explain why half of a pair of pantyhose belonging to Swearingen's wife was found in Swearingen's house and the other half around Ms. Trotter's neck. The new evidence does not explain why the same meal Ms. Trotter was last seen eating was found in her stomach. Swearingen lied about his whereabouts, tried to fabricate an alibi, made false police reports, fled from the police, asked friends to lie in his behalf, told others that the police would be after him, and crafted an ultimately inculpatory letter to throw attention away from himself. Swearingen told other inmates, "Fuck, yeah, I did it."

*Swearingen*, 2009 WL 4433221, at *23 (footnote omitted).[3]

### III.

We DENY authorization to file a successive habeas corpus petition. We DENY the motion for stay of execution.

---

[3] The TCCA today dismissed the claims Swearingen raises here as an abuse of the writ. *Ex parte Larry Ray Swearingen*, No. WR-53,613-14 (Tex. Crim. App. Aug. 15, 2019). Because we deny Swearingen's application on other grounds, we need not decide whether his claims are procedurally defaulted as well. *See In re Raby*, 925 F.3d at 755 n.7.

No. 19-20565

# APPENDIX

August 09, 2019

Bryce Benjet
Senior Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY  10013

Dear Mr. Benjet:

During testimony in this case, the DPS witness was asked to address the issue of contamination.  While this witness was qualified to answer questions concerning the possibility for contamination within the DPS laboratory or based on the packaging and condition of the evidence, she had no direct knowledge about how the evidence in question was collected or stored prior to its submission to DPS.  Because of this, a more appropriate answer would have been that she could not speak to the possibility of contamination of the samples when they were outside of the control of the DPS laboratory.

Additionally, the DPS witness had an insufficient basis upon which to develop an opinion regarding contamination of the samples.  Nonetheless, during testimony, she expressed an opinion that the profile from a particular sample was the product of contamination based on the color of the samples and lack of degradation of the DNA profile.   If this witness was going to answer questions during testimony about possibilities at all, she should have explained the full range of possibilities.  The full range of possibilities include contamination or that it was not contamination and the profile did come from the evidence.

Sincerely,

Brady W. Mills
Crime Laboratory Director
Crime Laboratory Service

12

No. 19-20565

# APPENDIX

July 19, 2019

Bryce Benjet
Senior Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY 10013

Dear Mr. Benjet:

I have reviewed your correspondence entitled "Request for Correction, L-268694" dated June 18, 2019 regarding the trace evidence testimony.

After a review of the case records I do not believe that Ms. Musialowski's testimony constitutes professional negligence or professional misconduct and thus do not see a basis for the Crime Lab to report this matter to the Texas Forensic Science Commission pursuant to Article 38.01, Sec. 4, Texas Code of Criminal Procedure.

In regards to Issue II (Source Attribution), I disagree with the assertion that she directly associated the fibers in this case with any particular piece of evidence. In fact, there's one instance where she corrects the attorney who used the term "cross-matching" to indicate the correct terminology of "similar." The word transference is used quite a bit in both direct and cross examinations. This is not a trace evidence term that was added by our Criminalist. Ms. Musialowski corrects definitive statements from the attorney and during both direct and cross examination there is a very clear discussion regarding what the limitations of the statement "similar to" are and that she was only comparing class characteristics that can be found in a group of items during her testimony. Further, the court display was intended to supplement testimony provided by Ms. Musialowski. It does not make any commentary regarding source attribution of any of the hair or fiber evidence.

In regards to Issue III (Unique Physical Match), the terms "unique" and "to the exclusion of others" were common language throughout the forensic community, at the time, in regards to physical matches and footwear/tire comparisons when accidental characteristics were located. This was accepted in reports and in testimony at the time this work was completed in our laboratory. Today we would report that the two pieces were once joined, but would not include the statement "to the exclusion of all others." This is the highest level of association we make and is listed in the Trace Categories of Association in the report addendum. She did not err in her reporting or testimony regarding this topic but if she were to report out this comparison today, the terminology would be different.

Issue III also questions her ability to assess a physical match on pantyhose given that they are an elastic fabric. An examiner must always assess the characteristics that are present to determine if there is sufficient detail to make a comparison and association. You indicate that a broken piece of pottery with a straight edge is a better material for doing a jigsaw comparison, but if there are not features along the edge, no curve, no striations, and/or only a small area, then this may not contain sufficient information for comparison. The pantyhose cannot be dismissed automatically as not being a suitable material for comparison and there is not anything scientifically invalid about her attempt at the comparison or the comparison itself.

Your letter indicates that you have sent your Request for Correction to the Texas Forensic Science Commission. We would fully cooperate with the Commission or the courts regarding any hearings or reviews they may choose to conduct.

Sincerely,

Brady W. Mills
Crime Laboraory Director
Crime Laboratory Service
Law Enforcement Service Division

13