

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. AP-77,043 & AP-77,044

### THE STATE OF TEXAS

### v.

### LARRY RAY SWEARINGEN, Appellee

### ON DIRECT APPEAL IN
### CAUSE NO. 99-11-06435-CR FROM THE 9TH DISTRICT COURT
### MONTGOMERY COUNTY

KEASLER, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, JOHNSON, HERVEY, and RICHARDSON, JJ., joined. YEARY and NEWELL, JJ., join Part IIB of the opinion. YEARY, J., filed a concurring and dissenting opinion, in which NEWELL, J, joined. ALCALA, J., filed a dissenting opinion.

## O P I N I O N

The trial judge granted Larry Swearingen's request for post-conviction DNA testing of several pieces of evidence under Texas Code of Criminal Procedure Chapter 64. The judge also conditionally granted Swearingen's motion to release certain evidence for preliminary testing to determine whether the evidence contained biological material. Because we once again find that Swearingen fails to satisfy Chapter 64's requirements, we

reverse the judge's order. We dismiss the State's appeal challenging the conditional order.

## I. Facts and Procedural History

After being found guilty of the 1998 capital murder of eighteen-year-old Melissa Trotter, Swearingen was sentenced to death on July 11, 2000. His conviction was affirmed on direct appeal.[1] We have found the following previous findings of fact surrounding the substantial inculpatory evidence presented at Swearingen's trial supported by the record:

- On the evening of December 7, 1998, two of [Swearingen's] acquaintances, the Fosters, witnessed a phone conversation in which [Swearingen] arranged for a lunch meeting with a girl at a library the following day, and [Swearingen] then told the Fosters that the girl was Melissa Trotter, a college student from Willis.

- Three witnesses saw [Swearingen] sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.

- Melissa's Biology teacher saw her leave the Montgomery College library with a male shortly after 1:30 p.m. that day.

- Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998.

- At 2:05 p.m. on December 8, 1998, [Swearingen] called Sarah Searle and said that he was at lunch with a friend.

- Sometime around 3:00 p.m. on December 8, 1998, [Swearingen's] landlord saw [Swearingen's] truck leaving from behind his home.

- At 3:03 p.m. on December 8, 1998, [Swearingen] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [Swearingen] driving from his home to the

---

[1] *Swearingen v. State*, 101 S.W.3d 89 (Tex. Crim. App. 2003).

Sam Houston National Forest.

- [Swearingen's] wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingens' property was missing.

- [Swearingen's] wife observed Melissa's cigarettes and lighter in [Swearingen's] house that evening, and those items were subsequently recovered from [Swearingen's] home during the investigation.

- Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in [Swearingen's] car and his home on the day of her disappearance.

- [Swearingen] filed a burglary report falsely claiming that he had been out of town and his home was broken into on the day of Melissa's disappearance.

- Between the time of Melissa's disappearance and [Swearingen's] arrest, [Swearingen] told two acquaintances on two different occasions that he believed police would be after him.

- When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [Swearingen], who claimed he did not remember the last name of the girl with whom he had met the day before.

- When Mrs. Foster told [Swearingen] that she recalled him saying the last name was "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead.

- [Swearingen] led a Sheriff's deputy on a high speed chase.

- Following [Swearingen's] arrest, law enforcement authorities observed and photographed red marks on [Swearingen's] neck, cheek, and back.

- On December 17, 1998, two neighbors of [Swearingen's] mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her.

- Melissa's body was discovered in an area of the Sam Houston National Forest with which [Swearingen] would have been familiar from previous time spent there.

- Melissa's body showed signs of significant decomposition when it was discovered in the woods 25 days after her disappearance.

- The ligature found around Melissa's neck matched the remainder of a pair of pantyhose found within [Swearingen's] home.

- The Harris Country Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there.

- The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with [Swearingen] and the Chicken McNuggets she and [Swearingen] had apparently purchased at the nearby McDonald's on the day of her disappearance.

- While in jail, [Swearingen] attempted to create an exculpatory letter written in Spanish in which he claimed to be someone else who had knowledge of Melissa's murder.

- Within that letter, [Swearingen] detailed specifics of the offense that accurately corroborated the physical and medical evidence in the case.

- While in jail awaiting trial, [Swearingen] told a cell mate that he had committed the capital murder and his only objective was to escape the death penalty.[2]

This is certainly not Swearingen's first foray in post-conviction DNA testing. He filed

Chapter 64 motions in October 2004, May 2008, and January 2009. All were denied by the

---

[2] *Swearingen v. State*, 303 S.W.3d 728, 737–38 (Tex. Crim. App. 2010).

trial judge. In January 2013 he filed his fourth motion. The judge granted the request, but we reversed.[3] In May 2014, approximately three months after our opinion, Swearingen filed a supplemental request for testing—a fifth motion under Chapter 64. In it, he requested post-conviction DNA testing of several pieces of evidence. In the granting Swearingen's request, the judge found that (1) the evidence identified in Swearingen's motion exists, contains biological material, is in a condition suitable for DNA testing, and subject to sufficient chain of custody, (2) that identity was an issue in this case, and (3) it is probable that Swearingen would not be convicted if exculpatory results were obtained through testing. The order then directed DNA testing of all the requested pieces of evidence:

1. "Fingernail scrapings from Ms. Trotter's left and right hands, Trial Exhibit #219."

2. "The ligature used to strangle Ms. Trotter (torn pantyhose), Trial Exhibit #169, and hair and other samples collected from ligature."

3. "The pantyhose comprising the other half of the ligature, Trial Exhibit #175, and hair and other samples collected from pantyhose."

4. "Four (4) cigarette butts found near Ms. Trotter's body, not offered at trial."

5. "Items of Ms. Trotter's clothing as follows:
   a. Ms. Trotters [sic] bra, Trial Exhibit #163;
   b. Ms. Trotter [sic] blue jeans, Trial Exhibit #165;
   c. Ms. Trotter's sweater, Trial Exhibit #166;
   d. Ms. Trotter's underwear, Trial Exhibit #167; and
   e. Ms. Trotter's black shirt (Not entered as an exhibit, but collected and bagged at autopsy);"

---

[3] *State v. Swearingen*, 424 S.W.3d 32 (Tex. Crim. App. 2014).

6.    "Rape Kit"; and

7.    "Hairs collected from body, gloves used to move Trotter's body, and hairbrush found near scene."

The judge's second order conditionally granted a Motion for Release of Evidence "if it is later determined that the proof of the existence of biological material is insufficient." The judge signed these orders without conducting any evidentiary hearing and a mere six months after we held that Chapter 64 did not entitle Swearingen to DNA testing of most of the same pieces of evidence.[4]

## II. Analysis

Under Chapter 64, a "convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material."[5] But the convicting court can only order this testing if five requirements are met:

(1)    "the court finds that the evidence still exists and is in a condition making DNA testing possible;"

(2)    "the court finds that the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;"

(3)    "the court finds that identity was or is an issue in the case;"

(4)    "the convicted person establishes by preponderance of the evidence that the person would not have been convicted if exculpatory results had been obtained through DNA testing;" and

---

[4] *Id.* at 35, 39.

[5] TEX. CODE CRIM. PROC. art. 64.01(a-1).

(5)    "the convicted person establishes by preponderance of the evidence that the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice."[6]

Chapter 64 motions are also subject to the "law of the case" doctrine.[7] According to that doctrine, "an appellate court's resolution of questions of law in a previous appeal are binding in subsequent appeals concerning the same issue."[8] Therefore, "when the facts and legal issues are virtually identical, they should be controlled by an appellate court's previous resolution."[9] Such a rule promotes "judicial consistency and efficiency."[10]

## A.    Order granting DNA testing under Chapter 64

This Court has previously published opinions refusing Swearingen's Chapter 64 motions pertaining to the particular pieces of evidence (1) through (5) listed above.[11] Most recently, in 2014, we unanimously reversed this judge's granting Swearingen's prior Chapter 64 motion requesting DNA testing of that evidence. We held that under the "law of the case" doctrine, the judge erred when he granted testing of pieces of evidence (2) through (5).[12] We

---

[6]  *Id.* art. 64.03(a).

[7]  *Swearingen*, 424 S.W.3d at 35–36.

[8]  *Id.*

[9]  *Id.*

[10]  *Id.*

[11]  *Swearingen*, 424 S.W.3d at 32; *Swearingen*, 303 S.W.3d at 737–38.

[12]  *Swearingen*, 424 S.W.3d at 38 ("Since we have previously held that, as a matter of law, the appellee had not met his burden of proof as to the existence of biological material, and because the legislature's amendment did not alter this result except in the

also held that Swearingen was not entitled to DNA testing of the fingernail scrapings because we were "not persuaded that results showing the presence of another DNA donor in the fingernail scrapings would overcome the 'mountain of evidence' of [Swearingen's] guilt."[13] And in our 2010 unanimous opinion, we noted that the evidence of Swearingen's guilt was "overwhelming" and that "even if we were to grant [his] request to test all of the items proffered and those results were exculpatory, [he] cannot show by a preponderance of the evidence, or that there is a 51% chance, that he would not have been convicted."[14] We noted that the trial judge made "supported-by-the-record findings of fact that again, underscore the substantial evidence of guilt."[15] Because we find that the record does not contain any change in the law, facts, or circumstances since our 2014 opinion and the granting of Swearingen's latest Chapter 64 motion, we see no reason to revisit our previous holdings on the matter. We hold that the judge erred in granting the DNA testing request of the items listed as (1) through (5) above.

The judge, however, found our 2010 holdings inapplicable in that "Swearingen's

---

case of the fingernail scrapings, the trial court erred under the law of the case doctrine when it disregarded our previous holding. The appellee is not entitled to testing of the ligature, the victim's clothing, or the cigarette butts.").

[13] *Id.* at 38–39 ("Primarily, this is because the victim's having encountered another person would not factually exclude [Swearingen] from having killed her. There are many ways someone else's DNA could have ended up in the victim's fingernails. Such results would not require an inference that [Swearingen] would [have] been acquitted.").

[14] *Swearingen*, 303 S.W.3d at 736.

[15] *Id.* at 737.

current request includes additional probative evidence such as the rape kit, hair evidence and cigarette butts." Including cigarette butts as a distinguishing factor is clearly wrong. Swearingen sought testing of the cigarette butts in 2010 and 2014. To the extent the rape kit and hair evidence present entirely new requests, they do not prove that this current request should be resolved any differently than in our 2010 and 2014 conclusions. Swearingen is still unable to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing.[16]

The judge's determination that Swearingen satisfied this requirement rests largely on two theories:

(1) "these results would both rule out an innocent explanation for the presence of the foreign DNA and would likewise provide support for Swearingen's contention that the pantyhose found outside his home was planted"; and

(2) "Swearingen pointed to several alternative suspects as well as known killers active in the area at the time. There would be no innocent explanation for finding the DNA of an alternative suspect or known killer on or in the victim or at the crime scene. . . . The strength of this [new-found] evidence [of a known killer's involvement] would be greatly increased if subsequent investigation of that individual produced additional evidence of guilt such as a confession or a false denial of contact with the victim or the scene."

The judge's order does not take into consideration what we referred to in our 2010 and 2014 opinions as the "mountain of inculpatory evidence" Swearingen faced at trial. In fact, the current judge's discussion of the relevance of potential results omits the most inculpatory pieces of evidence admitted against Swearingen. Further, the judge's findings are entirely

---

[16] *See* TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A).

speculative, especially when considered in the context of all the admitted evidence. We faulted Swearingen in 2014 for attempting to rely on the ramifications of hypothetical matches from evidence that eviscerate Chapter 64's requirements.[17] And it is even more attenuated to assume hypothetical confessions and false denials of contact stemming from hypothetical DNA matches. Once again, Swearingen cannot establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. For the foregoing reasons, we vacate the order granting Chapter 64 testing.

**B.    Conditional order granting the release of evidence for preliminary testing**

The judge's second order dismissed as moot Swearingen's Motion for Release of Evidence because he had granted Swearingen's requested Chapter 64 DNA testing. The order continued nonetheless and purportedly granted the motion in the alternative. It is this language that forms the basis of the State's separate appeal:

> However, the Court finds that, pursuant to the amended Article 64.01(a), that the defendant would have the right to demonstrate the presence of "identifiable" biological material which "may be suitable" for testing. Accordingly, this Court would GRANT the motion in the alternative if it is later determined that the proof of the existence of biological material is insufficient.

---

[17] *See Swearingen*, 424 S.W.3d at 39 ("A requirement to assume that the results of testing were not only from someone other than the convicted person but that the other person was a repeat offender . . . makes it hard to imagine a case in which we would not grant DNA testing. Such compelling DNA results would certainly overcome any mountain of inculpatory evidence. We believe that had the legislature meant to so drastically lower the barrier for Chapter 64 testing, they would have said so explicitly.")

> . . . .
>
>      . . . [I]f the evidence of the existence of biological material pursuant to Article 64.01(a) is subsequently determined to be insufficient, the Motion [for Release] is GRANTED.

However, the State is unable to appeal this conditional order. The State claims that it may, citing Article 44.01 because the order was "issued under Chapter 64,"[18] and Article 64.05's broad phrase allowing "appeals under this chapter."[19] While resolving the issue here would perhaps "provide an orderly and expeditious means for review of a potentially unauthorized order,"[20] we hold the State cannot contest the order's validity by way of appeal. The conditional order appears to be effective, if at all, in the event that this Court holds that Swearingen was not entitled to Chapter 64 testing. In other words, the conditional order rests on grounds outside the bounds of Chapter 64.

In *State v. Patrick*, a plurality of this Court held that the State could not appeal a judge's order granting testing that did not purport to be based on Chapter 64.[21] The *Patrick* plurality held that the proper avenue to contest the order was through a writ of mandamus, which it conditionally granted, holding the judge was "clearly and indisputably without

---

[18] TEX. CODE CRIM. PROC. art. 44.01(a)(6) ("The state is entitled to appeal an order of a court in a criminal case if the order: . . . (6) is issued under Chapter 64").

[19] *Id.* art. 64.05 ("An appeal under this chapter is to . . . [the court of criminal appeals] if the convicted person was convicted in a capital case and was sentenced to death . . . .").

[20] State's Brief at 5.

[21] *State v. Patrick*, 86 S.W.3d 592, 594 (Tex. Crim. App. 2002).

jurisdiction to issue the order in question."[22]   The plurality held that a trial court does not possess any inherent powers extending beyond the powers granted to it under Chapter 64 that would permit it  from granting preliminary testing.[23]   Unlike *Patrick*, the State does not seek mandamus relief along side its appeal.  Accordingly, we must dismiss this State's appeal.

### III. Conclusion

For the foregoing reasons, in cause number AP-77,043, we reverse the judge's order granting DNA testing under Chapter 64 and remand for proceedings in accordance with this opinion.  In cause number AP-77,044, we dismiss the State's appeal challenging the judge's order conditionally granting the release of evidence.

DELIVERED: October 28, 2015

PUBLISH

---

[22]  *Id*. at 594–95

[23]  *Id*. at 596 ("Any inherent powers possessed by the trial court as a result of its jurisdiction under Chapter 64 would necessarily be limited by Chapter 64.").