

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-23-00131-CR

MARIAN FRASER, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 19th District Court
McLennan County, Texas
Trial Court No. 2014-158-C, Honorable David Hodges, Presiding

October 1, 2024

MEMORANDUM OPINION

Before PARKER and DOSS and YARBROUGH, JJ.

This tragic case involves the death of four-month-old C.F.—determined to be caused by ingestion of diphenhydramine (Benadryl).[1]

---

[1] This case is before this Court for a third time. *See Fraser v. State*, 523 S.W.3d 320 (Tex. App.—Amarillo 2017) (reversing conviction) (*Fraser I*), *rev'd* 583 S.W.3d 564 (Tex. Crim. App. 2019) (reversing and remanding) (*Fraser II*); *Fraser v. State*, 593 S.W.3d 883 (Tex. App.—Amarillo 2019, pet. ref'd) (*Fraser III*).

Following a plea of not guilty, Appellant, Marian Fraser, was convicted by a jury of felony murder and sentenced to fifty years' confinement.[2]  She challenges her conviction by the following issues:

(1) The evidence is insufficient to prove she gave the victim diphenhydramine.

(2) The evidence is insufficient to prove administering diphenhydramine to a child is an act clearly dangerous to human life.

(3) The trial court erred in denying her motion to suppress search warrants lacking particularized facts establishing probable cause.

(4) The trial court erred in repeatedly admitting speculative and unproven extraneous offenses.

(5) She suffered egregious harm by a jury charge that failed to require the essential element that an act clearly dangerous to human life be "in furtherance of" the underlying felony.

(6) The jury charge contained other errors which when combined resulted in egregious harm.

(7) She was denied a fair and impartial trial by the trial court's failure to exercise its discretion for a change of venue due to a prejudice-ridden environment.

(8) Her Sixth Amendment rights were violated by admission of the autopsy findings that changed the manner of death from undetermined to homicide based on invalid testing.

(9) The evidence was insufficient to support felony murder because there was not an act clearly dangerous to human life separate from the act constituting the underlying felony.

(10) The jury charge was fundamentally defective by allowing a felony murder conviction based on a single act.

We affirm.[3]

---

[2] TEX. PENAL CODE ANN. § 19.02(b)(3) (referred to as the felony murder statute).

[3] Originally appealed to the Tenth Court of Appeals, this appeal was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  TEX. GOV'T CODE ANN. § 73.001.

## BACKGROUND

For more than two decades, Appellant operated a State licensed daycare center out of her home in Waco, Texas, and her services were in high demand. She generally limited her care to twelve infants, all under the age of two years. The infants were kept on a well-defined daily schedule that included naptime between the hours of 12:00 and 3:00 p.m. and she discouraged parents from interrupting the daily routine.

The four-month-old victim, C.F., began staying at Appellant's daycare on January 2, 2013. In late January, she was sleeping a lot and developed a cough around mid-February. Later in February, she had a fever which her mother attributed to routine immunizations.

On March 4, 2013, Appellant and Sherri Adams were working at the daycare. C.F. arrived at the daycare at approximately 7:45 a.m. She generally brought her own bottle because she would not finish it at home, and it was usually given to her between 8:15 and 8:30 a.m. Between 11:15 and 11:30, Appellant gave C.F. a bottle. She was solely responsible for preparing bottles for the children.

C.F. generally slept in a baby swing during naptime but on that day, Appellant placed her in a bed because she was moving more. As required by State licensing standards, she placed C.F. on her back. She checked on the children every fifteen minutes or so.

---

Should a conflict exist between precedent of the Tenth Court of Appeals and this Court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

3

Around 2:30 p.m. on March 4, Appellant received a phone call from a parent who wanted to pick up her child early. That child slept in the bed next to C.F. When Appellant went to get the child, she noticed that C.F. had rolled over and thrown up. She was unresponsive and not breathing and Appellant began compressions and CPR. She instructed Adams to call 911. When EMTs arrived, they continued CPR and took C.F. to the hospital. Appellant rode in the ambulance with C.F and C.F.'s mother was contacted.

C.F. was pronounced dead approximately an hour after arriving at the hospital. She was the McLennan County Judge's granddaughter, and her death garnered much attention. C.F.'s parents initially believed she had died from sudden infant death syndrome. Her body was sent to a forensic institute in Dallas for an autopsy. A toxicology report revealed that she had a high level of diphenhydramine in her system when she died.

Experts testified that diphenhydramine is an antihistamine commonly used as the active ingredient in over-the-counter medications such as Benadryl and other medications commonly used to treat allergy and cold symptoms. It can cause sedation and sleepiness and in excess amounts can affect bodily functions like heartbeat and respiration which can result in death. It is especially harmful to infants because their underdeveloped livers are unable to metabolize it and it remains in their system for longer periods of time.

During the investigation, other parents had their children tested and diphenhydramine was found in varying levels in all of those tested.[4] The Childcare

---

[4] The hair follicle test results were admitted in the first trial but were not admitted in the retrial due to the laboratory and doctor being discredited. The State instead presented extraneous testimony from some of the parents who testified to their children's ailments which they attributed to exposure to diphenhydramine. The extraneous evidence is discussed *infra* in issue four.

Licensing Department of the Texas Department of Family and Protective Services requires written authorizations from parents for dispensing over-the-counter medications. Unfortunately, Appellant usually obtained consent via text messages. When she became aware of the State licensing regulations, she panicked about not having followed protocol.

The licensing department received an intake of C.F.'s death on the night of her death and immediately opened an investigation. The administrator for daycare investigations went to Appellant's home that evening. The next day, the case was assigned to a childcare investigator. She interviewed Appellant, Adams, C.F.'s parents, other parents, and a detective.

The investigator cited Appellant for, among other violations, physical abuse and neglect and not using good judgment. Thereafter the case was given to licensing inspectors who made unannounced visits. Appellant was asked to close the daycare pending the investigation, but she agreed to do so only for a week because other parents expressed a need for childcare. The State's investigation revealed that Appellant stored over-the-counter medications in a cabinet together with some prescription medications. One of the bottles labeled for allergy relief contained diphenhydramine. There was also a pill crusher and a scale in the cabinet for diphenhydramine pills a veterinarian had prescribed for Appellant's dog. After State licensing completed its investigation, the matter was disposed of as "reason to believe" the incident happened under Appellant's care. The daycare closed permanently in late May 2013 and Appellant was cited for physical abuse of C.F.

During an interview with a detective in May 2013, Appellant claimed she never administered diphenhydramine to C.F. But she soon became the primary suspect in C.F.'s death. By her own admission, she was the only person who prepared C.F.'s bottles or administered any medications.

On January 22, 2014, a McLennan County Grand Jury indicted Appellant for the offense of murder based upon the theory that she "did then and there commit or attempt to commit an act clearly dangerous to human life, namely, by administering diphenhydramine to [C.F.] and/or causing [C.F.] to ingest diphenhydramine, which caused the death of [C.F.], and the said [Appellant] was then and there in the course of or attempted commission of a felony, to-wit: "Injury to a Child" (Paragraph I) or "Endangering a Child" (Paragraph II). Following her retrial and murder conviction in 2023, Appellant pursued this appeal.

**ISSUES ONE AND TWO—SUFFICIENCY OF THE EVIDENCE**

By her first issue, Appellant maintains the evidence is insufficient to prove she gave C.F. diphenhydramine and by issue two, she asserts the evidence was insufficient to prove that administering the drug to a child is an act clearly dangerous to human life. We disagree.

**STANDARD OF REVIEW**

The only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*. See Adames v. State*, 353 S.W.3d

6

854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). We consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Baltimore v. State*, 689 S.W.3d 331, 340–41 (Tex. Crim. App. 2024); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). A jury is permitted to draw reasonable inferences from the evidence and may use common sense, common knowledge, personal experience, and observations from life when drawing those inferences. *Baltimore*, 689 S.W.3d at 342. We give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

We compare the elements of the offense as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial and whether properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

**APPLICABLE LAW**

7

Felony murder is an unintentional murder committed in the course of committing a felony other than manslaughter. *Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007). It is a murder committed in the act of committing another felony. *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014). The State must prove the elements of the underlying felony, including the culpable mental state for that felony, but no culpable mental state is required for the murder committed. *Lopez v. State*, 582 S.W.3d 377, 394 (Tex. App.—San Antonio 2018, pet. ref'd). Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A person commits injury to a child if she intentionally, knowingly, or recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission causes to a child serious bodily injury. TEX. PENAL CODE ANN. § 22.04(a)(1). Serious bodily injury is defined as bodily injury that creates a substantial risk of death or that causes death. TEX. PENAL CODE ANN. § 1.07(46).

## ANALYSIS

The State was required to prove Appellant committed injury to an infant—administering diphenhydramine—and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, she committed or attempted to commit an act clearly dangerous to human life which caused C.F.'s death. TEX. PENAL CODE ANN. § 19.02(b)(3).

Appellant is highly critical of the failure of law enforcement to test various items seized which she claims could have negated that C.F. ingested diphenhydramine in the

8

daycare. This Court does not review the adequacy of law enforcement's investigation in conducting a sufficiency analysis; review is limited to the evidence presented at trial. *See Badger v. State*, No. 02-18-00475-CR, 2019 Tex. App. LEXIS 9037, at *13 n.5 (Tex. App.—Fort Worth Oct. 10, 2019, pet. ref'd) (mem. op., not designated for publication). We do not speculate on the lack of evidence presented by the State. *Id.*

The medical examiner testified, based on medical literature, that the amount of diphenhydramine in C.F.'s postmortem blood was 1.3 milligrams per liter which was significant enough to cause death.[5] However, the medical examiner could not determine how C.F. ingested the drug or whether it was administered in a large dose or numerous smaller doses. In a May 28, 2013 autopsy report, she listed the cause of death as "toxic effects of diphenhydramine" and manner of death as "undetermined."

Subsequent toxicology tests revealed a toxic level of diphenhydramine in C.F.'s postmortem blood. A few months later, based on information conveyed by a detective, the medical examiner prepared a second autopsy report changing the manner of death from undetermined to homicide.

Appellant did not testify in the second trial but her sworn testimony from a previous hearing was read into the record by agreement of the parties. She acknowledged that giving diphenhydramine to an infant under two years of age was potentially dangerous, but denied she was the person who administered it to C.F. Appellant insisted infants in her care were never given any substance containing diphenhydramine. Although positive

---

[5] Her testimony was based on literature because it is unethical to give drugs to children to perform studies.

hair follicle samples from other children at the daycare testing positive for diphenhydramine were admitted in the first trial, they were discredited and ruled inadmissible in the second trial. But parents of four children were allowed to testify their children suffered from ailments which could only be attributable to exposure to diphenhydramine. They testified some of their children's ailments improved after leaving Appellant's care.

One of the experts testified that if C.F. had ingested diphenhydramine before being dropped off at the daycare at 7:45 a.m., there would have been signs of lethargy or tiredness earlier in the day. But C.F.'s parents denied giving her diphenhydramine. The evidence showed that, while at the daycare, C.F. was never given any medications by any person other than Appellant, although Appellant also denied giving her diphenhydramine. Prior to naptime, Appellant always prepared the children's bottles.

Following C.F.'s death, Appellant's daughter who was home for Spring Break, texted Appellant that the "licensing lady" was in the driveway at the daycare. Appellant sent her daughter a text message asking her to move "the kids [sic] medicine that is in the cabinet in the daycare room [to her] closet. Just in case she looks."

The State presented expert testimony establishing that, although diphenhydramine is generally considered to be a safe drug when properly administered, it can become lethal if it builds up in a child's system, either through repeated smaller dosages over a period of time or by the administration of one large dose. The State's expert witness explained that because diphenhydramine can cause sedation, it should not be given to children under age two. The witness further established that it takes approximately two

10

years for a child's liver to fully develop and that the giving of medications to a child whose liver is not yet fully developed "can have unknown consequences and sometimes death . . . ." Accordingly, the expert opined that causing diphenhydramine to be ingested by a four-month-old infant constituted "an act clearly dangerous to human life."

Appellant argues that when used correctly, diphenhydramine does not pose a substantial risk of death and administering it cannot be an act clearly dangerous to human life. But the evidence showed the drug comes with a label warning against its use on infants. There was also evidence a pediatrician should be consulted when giving a young child diphenhydramine. The medical examiner testified the level of diphenhydramine "was just so high," "[i]t was her cause of death." The State established that giving the drug to a four-month-old was an act clearly dangerous to human life and resulted in death.

The how, when, where, and quantity of diphenhydramine to which C.F. was exposed was hotly contested. The State presented circumstantial evidence from which the jury could infer that Appellant gave C.F. diphenhydramine and that doing so was an act clearly dangerous to human life. The State also presented evidence from other parents whose children were under Appellant's care that various ailments could have been caused by ingestion of diphenhydramine and that some of their symptoms improved after leaving Appellant's care. Albeit unintentional, C.F.'s death resulted from ingestion of diphenhydramine. The expert testimony established that in a child as young as C.F., her liver was underdeveloped and could not metabolize the drug. The evidence showed the drug affects heart rhythm and causes respiratory issues which could be fatal. She had an extremely high level in her body which was determined to be the cause of her death.

11

Considering all the evidence presented, whether properly or improperly admitted, and viewing the evidence in the light most favorable to the verdict, we find the evidence is sufficient to support Appellant's conviction. Issues one and two are overruled.

**ISSUE THREE—MOTION TO SUPPRESS**

Two search warrants were obtained several months after C.F.'s death. The first warrant authorized a search of Appellant's home and resulted in seizure of cell phones, an iPad, and a computer. The affidavit in support of that warrant provided in relevant part as follows:

> Affiant knows that it is common for persons to access the internet for the purpose of obtaining drug information and reactions to various drugs. Internet access can be gained by the use of a variety of electronic devices to include but not limited to, computers, laptop computers, cell phones, and electronic notebooks and net books such as but not limited to iPads, ereaders [sic], and electronic tablets. Affiant also knows that it is common for persons to send electronic messages known as emails, text message, and to keep/store messages sent to other persons and to themselves on the above-mentioned electronic devices and on electronic storage devices such as thumb drives.
>
> Affiant is asking for a Search Warrant to search . . . any and all aforementioned electronic devices and electronic storage devices.

The second affidavit for a search of the devices added the following language:

> Affiant knows that a Forensic Search of the above listed electronic property/evidence **could reveal** a history of internet searches, electronic messages known as emails that are sent and received, text messages that have been sent and received, as well as messages and or postings on internet social sites such as but not limited to Facebook. A Forensic Search **may also** reveal stored messages and or correspondence sent to others or to themselves.
>
> Affiant believes that a Forensic Search of the above listed electronic property/evidence that was seized on June 13, 2013 . . . **may reveal** that [Appellant] **may have** searched the internet after the death of [C.F.] to obtain information on the side effect of diphenhydramine (Benadryl) on

12

> infants and young children.  Affiant also believes that a Forensic Search of these devices **may reveal** electronic mail messages, text messages, and or social networking site messages such as Facebook that were either sent or received by or to [Appellant] that **may contain** information about the death of [C.F.]

[Bolding in Appellant's brief].

Appellant filed a written motion to suppress then reurged her motion during a pretrial hearing.  Relying on *State v. Baldwin*, 664 S.W.3d 122 (Tex. Crim. App. 2022), *cert. denied*, __ U.S. __, 143 S. Ct. 777, 215 L. Ed. 2d 47 (2023), she argued at trial and does so here that the contents of her electronics should have been suppressed because the affidavits lacked sufficient particularized facts to establish probable cause. Particularly, she asserts the second affidavit contained no more than general statements and beliefs.  We disagree.

Ordinarily, a trial court's ruling on a motion to suppress is reviewed under a "bifurcated standard of review."  *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016).  However, when reviewing a magistrate's decision to issue a warrant, appellate courts apply a highly deferential standard of review because of the constitutional preference for searches conducted pursuant to a warrant over warrantless searches. *State v. McLain*, 337 S.W.3d 268, 271–72 (Tex. Crim. App. 2011); *Cobb v. State*, No. 10-16-00406-CR, 2017 Tex. App. LEXIS 5945, at *22–23 (Tex. App.—Waco June 28, 2017, pet. ref'd) (mem. op., not designated for publication).  Under the Fourth Amendment, an affidavit supporting a search warrant is sufficient if, from the totality of the circumstances reflected in the affidavit and the reasonable inferences it supports, the magistrate was provided with a substantial basis for concluding that probable cause existed.  *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004).  A defendant seeking suppression

13

of evidence obtained pursuant to a search warrant must prove by a preponderance that the evidence was obtained in violation of the Fourth Amendment. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *State v. Huynh*, 683 S.W.3d 803, 814 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

A reviewing court's duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011). Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location. *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App. 2022). Reviewing courts must give great deference to a magistrate's probable cause determination, including a magistrate's implicit finding. *McLain*, 337 S.W.3d at 271–72.

When ruling on a motion to suppress evidence obtained pursuant to a search warrant, a trial court is limited to the four corners of the warrant and affidavit supporting the warrant. *Id.* at 271. The affidavit is interpreted in a non-technical, commonsense manner drawing reasonable inferences solely from the facts and circumstances contained within the four corners of the affidavit. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). "When in doubt, we defer to all reasonable inferences that the magistrate could have made" that are supported by the record. *Id.* Where, as here, the trial court did not enter findings of fact,[6] we must uphold the trial court's ruling on any theory of law applicable to the case and presume the court made implicit findings in support of its ruling

---

[6] The record reflects the trial court intended to enter findings of fact, but none were filed.

14

if the record supports those findings. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

Relying on *Baldwin*, Appellant contends the affidavits failed to describe with sufficient particularity the items to be seized. The Court in *Baldwin* found a search warrant affidavit for a cell phone insufficient because it did not contain sufficient facts to establish a fair probability that the search of the cell phone would likely produce evidence in a murder investigation. 664 S.W.3d at 123. It held that boilerplate language in an affidavit for the search of a cell phone may be used "but to support probable cause, the language must be coupled with other facts and reasonable inferences that establish a nexus between the device and the offense." *Id.* The Court found the affidavit lacked information to "suggest anything beyond mere speculation that [Baldwin's] cell phone was used before, during, or after the crime." *Id.* at 135.

In the underlying case, the trial court admitted numerous text messages between Appellant and her daughter which occurred just days after C.F.'s death. Specifically, the daughter alerted Appellant that a representative from State licensing was in her driveway. Appellant texted her daughter to move the children's medications from a cabinet in the daycare to her closet "just in case" the representative looked. There was also an exchange of messages referring to the children's nap routine. Appellant indicated the children were not napping and she had "quit day care" during naptime on that day. Appellant contends admission of the text messages was harmful because during deliberations, the jury sent a note asking to review the text messages between Appellant and her daughter.

15

Appellant argues that just as in *Baldwin,* the search warrant affidavit did not establish that her cell phone was used to facilitate commission of the offense. While *Baldwin* is distinguishable but may have been useful to Appellant, she did not have the benefit of a recent case in which the Court of Criminal Appeals qualified its holding in *Baldwin* regarding an affidavit in support of a search warrant for cell phones. *See Stocker v. State*, __ S.W.3d __, No. PD-0711-22, 2024 Tex. Crim. App. LEXIS 516 (Tex. Crim. App. July 31, 2024). In *Stocker*, the Court characterized as "misguided," an appellate court's interpretation of *Baldwin* that an affidavit must show use of a cell phone either during, or immediately before or after, commission of the offense for which a defendant is on trial. Instead, the Court referred to article 18.0215(c)(5)(B) of the Texas Code of Criminal Procedure authorizing issuance of a search warrant for a phone if the "device is likely to produce evidence in the investigation of the criminal activity . . . ." *Id.* at *5.

In the underlying case, although the affidavits contained boilerplate language, they provided other factual information related to the investigation surrounding C.F.'s death. The affiant provided the following factual background in the four corners of the affidavit:

> On March 4, 2013, Affiant responded to Providence Hospital in Waco, McLennan County, Texas. Once at Providence Hospital Affiant found that C.F. a four-month-old infant had been found unresponsive at the Spoiled Rotten Day Care located at 1725 Hilltop Drive, Waco, McLennan County, Texas. C.F. was transported to Providence Hospital by ambulance where she was pronounced dead shortly after arrival at the hospital.

> Affiant was able to view the body of C.F. and saw no signs of trauma or injury to her. Affiant was also able to speak with Walter Perry Felton and Lauren Felton the parents of C.F. and found that C.F. had not been ill or having any unusual medical problems prior to her death. Affiant learned that Lauren Felton had taken C.F. to the Spoiled Rotten Day Care at around 7:45 AM on March 4, 2013, where she gave C.F. to Marian Fraser who is the owner/operator of Spoiled Rotten Day Care. At the time that C.F. was

16

dropped off at the day care by her mother she was described as normal and fine.

Affiant was able to speak with Marian Fraser the owner/operator of Spoiled Rotten Day Care. Marian Fraser told the Affiant that C.F. was fine that day of March 4, 2013, when her mother dropped her off at the day care. Marian Fraser told the Affiant that nothing unusual had happened or occurred with C.F. that day. Marian Fraser told the Affiant that C.F. was given her last bottle at around 11:30 AM on March 4, 2013, and that she then was put into her playpen to have a nap at around 12:30 PM. Marian Fraser told the Affiant that at around 2:50 PM that C.F. was found unresponsive in her playpen.

Affiant has learned from Marian Fraser that she operates the Spoiled Rotten Daycare at 1725 Hilltop Drive in Waco, McLennan County, Texas, and that this location is also her personal residence.

The body of C.F. was sent to the Southwestern Institute of Forensic Sciences in Dallas, Texas for an autopsy. Affiant has received a copy of the Autopsy Report of the autopsy that was conducted on C.F. The findings of the autopsy are that the Cause of Death of C.F. is from the Toxic Effects of diphenhydramine (Benadryl). Affiant has spoken with Dr. Keith Pinkard, Medical Examiner with the Southwestern Institute of Forensic Sciences. Dr. Pinkard has explained to the Affiant that the effects of diphenhydramine (Benadryl) are fast-acting. Dr. Pinkard has also told Affiant that with the information obtained in the Affiant's investigation that C.F. was fine and normal when she arrived at the daycare and was fine up to the time she was put down for her nap; that she would have had to of [sic] be given the diphenhydramine (Benadryl) while in the care and custody of the daycare.

The language complained of by Appellant is coupled with other facts and reasonable inferences sufficient to provide a substantial basis for a magistrate to conclude probable cause existed to search Appellant's electronics. Unlike in *Baldwin* in which police were trying to determine whether a particular person was involved in the crime, Appellant was already a suspect in C.F.'s death when the warrants were issued. The affidavit in support of the warrant to search Appellant's electronics contained the factual background of the case. It recited that Appellant was the person responsible for C.F.'s care and the only person who prepared her bottles. C.F. did not exhibit any signs

17

of trauma or abuse and the circumstances of her death occurred while in Appellant's care. The affidavit contained sufficient particularized facts supporting a search of Appellant's devices which would be "likely to produce evidence in the investigation" of C.F.'s death. Reviewing the entirety of the affidavits and giving the deference due a magistrate in its probable cause determination, we conclude the trial court did not abuse its discretion in denying Appellant's motion to suppress. Issue three is overruled.

**ISSUES FOUR AND EIGHT—ADMISSION OF EXTRANEOUS OFFENSES AND AUTOPSY REPORT**

By issue four, Appellant contends the trial court abused its discretion by repeatedly admitting extraneous-offense evidence from parents of other children cared for by Appellant. She acknowledges this Court previously found extraneous-offense evidence of hair follicle results showing the presence of diphenhydramine in other children cared for by her was properly admitted in her first trial. *See Fraser I*, 523 S.W.3d at 337–38. However, in this appeal, she argues that because the hair follicle results were not admitted in her retrial due to discreditation of the laboratory and the doctor who performed the tests,[7] the trial court abused its discretion in admitting extraneous testimony from parents of other children on their children's respective medical issues. She asserts that without test results, there was no link to the admission of evidence that other children may have ingested diphenhydramine.

A hearing outside the jury's presence was held for each of the four parents who testified regarding their respective children's ailments and whether their symptomologies

---

[7] Retesting could not be done due to destruction of the original samples.

were attributable to ingestion of diphenhydramine. Defense counsel objected on relevance grounds, lack of proof beyond a reasonable doubt, and on whether the probative value of the evidence outweighed unfair prejudice to Appellant. The objections were overruled, and defense counsel was granted running objections. Appellant maintains her objections preserved her complaint for review. We disagree.[8]

Generally, an objection reciting specific grounds and an adverse ruling will preserve a complaint for appellate review. TEX. R. APP. P. 33.1(a). However, under Rule 105 of the Texas Rules of Evidence, a party should request the court to restrict evidence to its proper scope at the time it is offered and request an instruction to preserve a claim of error. TEX. R. EVID. 105(b)(1). The request must be made "at the moment the evidence is admitted." *Hammock v. State*, 46 S.W.3d 889, 893, 895 (Tex. Crim. App. 2001). "A failure to request a limiting instruction at the time evidence is presented renders the evidence admissible for all purposes." *Williams v. State*, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008). Once the evidence is admitted for all purposes, "it is impossible for [jurors] to go back at the close of the trial and reassess the evidence in light of the limiting instruction, even if they could appreciate which items of evidence the instruction was supposed to apply to." *Hammock*, 46 S.W.3d at 895.

During the charge conference in the underlying case, defense counsel raised the issue of extraneous offenses and stated "an instruction that goes to the jury that if there is any extraneous offense or bad acts that before they can consider it, they must believe

---

[8] Preservation of error is a systemic requirement on appeal regardless of whether the issue was raised. *Ex parte Nuncio*, 662 S.W.3d 903, 913–14 (Tex. Crim. App. 2022) (citing *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009)).

19

it's been proven beyond a reasonable doubt. *We are not requesting that, we believe that it is trial strategy.*" (Emphasis added).[9] To preserve the complaint of admission of extraneous-offense evidence, defense counsel was required to request a limiting instruction at the time the evidence was admitted. *See Taylor v. State*, No. 06-22-00063-CR, 2022 Tex. App. LEXIS 8160, at *8–9 (Tex. App.—Texarkana Nov. 4, 2022, no pet.) (mem. op., not designated for publication). No such limiting instruction was requested when the objected-to evidence was offered, and counsel specifically announced it was trial strategy not to do so. Thus, the proper procedure for preserving a complaint on admission of extraneous-offense evidence was not completed. Issue four is overruled.

By her eighth issue, Appellant maintains her Sixth Amendment confrontation rights were violated by the State's proffer and admission of a second autopsy finding which changed the manner of death from undetermined to homicide. *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). She contends the medical examiner changed the finding based on information provided to her by a detective about the positive results of hair follicle tests of other children in Appellant's care. She also claims admission of the second autopsy finding violated the prohibition against hearsay and prevented her from presenting a complete defense. We agree the trial court erred in admitting the second autopsy report but conclude the error did not contribute to her conviction beyond a reasonable doubt. Tex. R. App. P. 44.2(a).

---

[9] During the first trial, the jury was instructed that evidence of other children under Appellant's care being exposed to diphenhydramine was admitted for the limited purpose of showing a common scheme, plan, or opportunity to administer the drug to children. The State's theory of Appellant's common scheme was that she wanted the children napping from noon until three every day.

20

The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against her. U.S. CONST. amend. VI. It applies to in-court testimony and testimonial statements made outside of court. *Molina v. State*, 632 S.W.3d 539, 543 (Tex. Crim. App. 2021). Out-of-court statements that are "testimonial" in nature are objectionable unless the prosecution can show the out-of-court declarant is presently unavailable to testify in court and the accused had a prior opportunity to cross-examine the declarant. *Langham v. State*, 305 S.W.3d 568, 575–76.

At a hearing outside the jury's presence, Dr. Elizabeth Ventura, who performed the autopsy on C.F. and who signed the second autopsy report, was questioned on the change in the manner of death from undetermined to homicide. The defense objected on Sixth Amendment grounds because the changed autopsy finding resulted from information which could not be challenged. The defense also made a hearsay objection.[10] The trial court overruled the objections and admitted the second autopsy finding. Dr. Ventura explained that the changed finding was based on information received from a detective described as "additional information." That information consisted of the hair follicle tests of other children in Appellant's care.

Autopsy reports are testimonial where an objective medical examiner would reasonably believe that the report would be used in a later prosecution. *Lee v. State*, 418 S.W.3d 892, 896 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).[11] An expert's opinion regarding an autopsy report does not violate the Confrontation Clause merely because it

---

[10] The autopsy report was a business record and a public record and thus an exception to the prohibition against hearsay. TEX. R. EVID. 803(6), (8).

[11] Dr. Ventura was not testifying as a surrogate for another medical examiner's report; she performed the autopsy on C.F. and signed the second report. *Cf. Bullcoming v. New Mexico*, 564 U.S. 647, 651, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011).

is based, to some degree, on inadmissible evidence provided that the facts or data is of a type on which experts in the field can reasonably rely. *See Paredes v. State*, 462 S.W.3d 510, 517–18 (Tex. Crim. App. 2015). *See also* TEX. R. EVID. 703 (providing that an expert may base an opinion on facts or data the expert *has been made aware of*) (emphasis added)). Here, however, Dr. Ventura's testimony was based, in part, on discredited hair follicle tests which were not admitted in the second trial. Her testimony relied on unreliable information which Appellant did not have an opportunity to challenge. We agree with Appellant that the trial court erred in admitting the second autopsy report. A Confrontation Clause violation, once proven, is subject to harmless error analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure. *Rubio v. State*, 241 S. W.3d 1, 3 (Tex. Crim. App. 2007).

## HARMLESS ERROR ANALYSIS

In conducting a harmless error analysis of constitutional error, the Court of Criminal Appeals has observed the following factors as relevant: (1) how important the out-of-court statement was to the prosecution; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the prosecution's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

Dr. Ventura's reliance on the hair follicle tests to support homicide as the manner of death was important to the State but was somewhat cumulative of extraneous testimony offered by parents who testified their children had ailments attributable to ingestion of diphenhydramine. Interestingly, Appellant could have but did not proffer the

22

original autopsy report which showed the manner of death as undetermined and would have allowed the jury to resolve the inconsistency.

The State's case was based solely on circumstantial evidence. There was no determination on how and in what manner C.F. ingested a lethal dose of diphenhydramine. C.F.'s parents and Appellant insisted they did not give her diphenhydramine; thus, the State needed evidence to contradict Appellant's defensive theory—a material point in the case. Dr. Ventura's expert testimony was critical for the State to satisfy its burden of proof.

We conclude the admission of the second autopsy report was not a contributing factor in the jury's deliberations and did not affect the integrity of the process leading to Appellant's conviction. *Id.* Thus, the trial court's error was harmless. Issue eight is overruled.

**ISSUES FIVE, SIX, NINE, AND TEN—JURY CHARGE ERROR**

Appellant contends she suffered egregious harm based on the following alleged errors contained in the jury charge:

- failed to require the essential element that an act clearly dangerous to human life be "in furtherance of" the underlying felonies;

- failed to include the elements of the underlying felonies;

- failed to state the mens rea required for the underlying felonies;

- failed to define manslaughter; and

- failed to contain an instruction on causation.

23

Relying on the dissent in *Fraser II* and *Johnson v. State*, 4 S.W.3d 254 (Tex. Crim. App. 1999), she asks this Court to apply statutory construction to determine whether the same act—administering diphenhydramine—can serve both as the underlying felony and an act clearly dangerous to human life.[12]

"An appellate court's resolution of questions of law in a previous appeal are binding in subsequent appeals concerning the same issue." *State v. Swearingen*, 478 S.W.3d 716, 720 (Tex. Crim. App. 2015). As the State correctly points out, Appellant's issues were previously addressed and resolved by this Court and the Court of Criminal Appeals in *Fraser I* and *Fraser II*. Thus, under the law of the case doctrine, which applies to criminal cases, *Ware v. State*, 736 S.W.2d 700, 701 (Tex. Crim. App. 1987), we decline to revisit the issues. We overrule issues five, six, nine, and ten.

**ISSUE SEVEN—DENIAL OF CHANGE OF VENUE**

Appellant asserts she was denied a fair and impartial trial by the trial court's failure to change venue on its own motion.[13] We disagree.

Article 31.01 of the Code of Criminal Procedure provides that a presiding judge may order a change of venue if he is not satisfied that a fair and impartial trial can be had in the county in which the case is pending. TEX. CODE CRIM. PROC. ANN. art. 31.01. Generally, a change of venue may be granted if there exists in the county where

---

[12] The Court of Criminal Appeals noted in *Fraser II* that it had previously rejected the same argument in *Johnson.* 583 S.W.3d at 570 n.40.

[13] Appellant filed a motion for a change of venue pursuant to article 31.03(a) of the Texas Code of Criminal Procedure. However, she concedes she did not fully comply with the statutory requirements. Nonetheless, she argues the trial court should have changed venue on its own motion under article 31.01 due to a prejudice-ridden environment.

24

prosecution is commenced so great a prejudice against her that she cannot obtain a fair trial and there is a dangerous combination against her instigated by influential persons, by reason of which she cannot expect a fair trial. TEX. CODE CRIM. PROC. ANN. art. 31.03(a)(1).

A change of venue is warranted because of pretrial publicity if "the publicity about the case was pervasive, prejudicial and inflammatory." *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001); *Gentry v. State*, 259 S.W.3d 272, 278 (Tex. App.—Waco 2008, pet. ref'd). Two primary means of discerning whether publicity is pervasive are a hearing on the motion to change venue and the voir dire process. *Gentry*, 259 S.W.3d at 278. If the accused raises "substantial doubts about obtaining an impartial jury" because of "widespread inflammatory news coverage," the constitutional right to a fair trial is implicated. *Id.* (citing *Phillips v. State*, 701 S.W.2d 875, 879 (Tex. Crim. App. 1985), *overruled on other grounds*, *Hernandez v. State*, 757 S.W.2d 744, 751 n.15 (Tex. Crim. App. 1988)). Publicity alone, however, does not establish prejudice or require a change of venue per se. *Willingham v. State*, 897 S.W.2d 351, 357 (Tex. Crim. App. 1995).

A transfer of venue is reviewed for abuse of discretion and will not be disturbed on appeal absent a showing of abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). A decision to deny a motion for change of venue is not outside the zone of reasonable disagreement merely because a number of venirepersons heard about the case from pretrial publicity. *Id.* at 450.

Appellant acknowledges the heavy burden of establishing community prejudice to the degree it resulted in the denial of a fair and impartial trial. *Renteria v. State*, 206

25

S.W.3d 689, 709 (Tex. Crim. App. 2006). But she argues the burden was met in her case because publicity was pervasive, prejudicial, and inflammatory. She asserts that for a decade, from the initial death in 2013 to the civil and criminal proceedings that followed, her community was "inundated with publicity that the county judge's granddaughter had been murdered by the daycare worker who gave her Benadryl." The county judge was an influential person, and his office was in the same building where the trial took place. He attended the proceedings and the defense's request to place him under the Rule was denied. She asserts the most harmful coverage, however, was the debunked hair follicle test results that she had given diphenhydramine to other children in her care.

At a pretrial hearing, the defense presented several long-time McLennan County residents who testified Appellant could not receive a fair trial in Waco or McLennan County. The witnesses had long-standing relationships with Appellant and knew her well through church. They testified the publicity surrounding Appellant's case was pervasive and negative. They also agreed C.F.'s relationship to the county judge, a respected individual who wields a great deal of political power, piqued interest in the case. One of the witnesses blamed the media for the negative publicity; the case earned the moniker "the Benadryl case." But during cross-examination, the witnesses admitted they probably followed the news more closely because they knew Appellant.

The witnesses testified Appellant's name continued to be discussed in close circles such as church groups or coffee groups. Conversations regarding her were very negative and social media comments were "hateful" and "hurtful" and intimated "she did it." But there was testimony that since the 2015 trial, coverage of the case had decreased.

26

Evidence showed McLennan County's population was approximately 250,000 during the first trial in 2015. One of the witnesses, who was well-connected in the community through his employment, church, several boards, and the Chamber of Commerce, approximated that based on an annual growth pattern of six percent, 10,000 people had probably moved to the county since 2015. He agreed newer residents would not have been following the local news at that time. He testified it was possible that a randomly selected group of people would not know Appellant and would not have formed any opinions about her. The trial court deferred its ruling on the motion to change venue until after a jury was seated and then denied the motion.

Appellant maintains the trial court's ruling was compounded because it denied a request for two additional peremptory challenges to remove venirepersons who had knowledge of the case.[14] She asserts the ruling also resulted in juror misconduct when, after the defense rested, three jurors sent a note to the trial court complaining of a juror who was following the case on Twitter. The trial court excused that juror, replaced him with an alternate juror, and questioned other jurors who represented they could be fair. But Appellant insists the negative publicity nevertheless permeated deliberations and removed her presumption of innocence.

The trial court took measures to seat an unbiased jury. A questionnaire was prepared to address the possibility of venirepersons who may have been influenced by negative publicity. Based on the answers to the questionnaire, both sides agreed to

---

[14] The State argues the defense was not entitled to two additional peremptory challenges because it should have challenged the potential jurors for cause but did not do so.

discharge forty-two venirepersons. Also, the trial court ordered individual voir dire to eliminate prospective jurors who had already formed opinions based on pretrial publicity.

In the underlying case, the evidence at the hearing on the motion for a change of venue showed that a small fraction of the population of the county who knew Appellant well were closely following the trial. Publicity and media coverage does not rise to an automatic showing of prejudice entitling a defendant to a change of venue. *Renteria*, 206 S.W.3d at 709. Jurors were not required to be completely ignorant of issues in the case. *Id.* Additionally, the trial court used the jury selection process to gauge the community's climate of opinion. *Colone v. State*, 573 S.W.3d 249, 257 (Tex. Crim. App. 2019). We conclude based on the testimony from the hearing on the motion to change venue and the precautions taken during the voir dire process, the trial court did not abuse its discretion in retaining venue in McLennan County. Issue seven is overruled.

## CONCLUSION

Having overruled all ten issues, we affirm the trial court's judgment.

Alex Yarbrough
Justice

Do not publish.

28